[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION AFTER TRIAL
This matter arises from the plaintiffs' claims that the defendant failed to meet his obligations to perform satisfactory roofing and construction work upon their separate homes in East Hartford, Connecticut. The plaintiffs June Harrington and Mildred Briner have alleged that they each entered into a written agreement with the defendant, Joseph Grillo d/b/a Carpentry Unlimited, through which he undertook to provide professional services for replacement of the existing roofs upon their homes, and through which he further contracted to perform other carpentry work upon the Briner residence.
Each plaintiff's claims have been brought in two counts through the single Amended Complaint dated June 9, 2000. Count One sounds in contract, alleging that Harrington has suffered money damages as the result of the defendant's failure to honor the applicable contract. Count Two sounds in fraud, asserting that Harrington has suffered due to the defendant's fraudulent misrepresentations that he would perform the construction work according to standard building practices and building code requirements. Counts Three and Four, brought on Briner's behalf, raise like claims based on breach of contract and fraudulent misrepresentation, respectively.[1]
Through his Answer and Special Defenses dated August 31, 1998, the defendant has admitted that he was a home improvement contractor doing business at Carpentry Unlimited at the times referenced in the complaint. The defendant has further admitted that he entered into a contract with Harrington for the performance of roofing work at her home; that he completed this work; and that this homeowner paid him $3,986.00 in full satisfaction of the terms of their agreement. The defendant has also admitted that he entered into a contract with Briner for home improvements including roofing work; and that she paid him a total of $9086.00 in full satisfaction of their agreement. The defendant has denied the remaining allegations of the complaint, or has left the plaintiffs to their proof In addition, the defendant has asserted, as a special defense, Harrington's assignment of her claim to Liberty Mutual Insurance Company (Liberty), who had provided her with homeowner's benefits to cover the losses she claims to have suffered as the result of the defendant's breach of contract and fraudulent misrepresentation. CT Page 14934 Harrington denies this special defense, claiming that Liberty had paid only a portion of the damages sustained.
This matter was consolidated for trial with Liberty Mutual InsuranceCo. v. Carpentry Unlimited, Docket No. CV 97-0570768, a subrogation claim brought by the insurer to recover the amounts paid to Harrington as the result of the incidents at issue.[2] Both cases, and thus the claims of all three plaintiffs, were tried to the court on June 9 and June 29, 2000. All parties were represented by skilled and experienced counsel, who elected to submit written briefs in lieu of oral argument. Those briefs, which contained thorough and detailed attention to the varied and significant legal and evidentiary issues presented in these trials, were received by the court under date of July 28, 2000.
After due consideration of the issues presented through the totality of the evidence, including the testimony of the multiple witnesses and the submission of the numerous exhibits which included technical information, and having reflected upon the parties' written legal arguments, the court finds the operative breach of contract issues in favor of the plaintiffs in both actions. The court finds the claims of fraudulent representation in favor of the defendant. Accordingly, the court here awards fair, just and reasonable damages to the plaintiffs June Harrington and Mildred Briner, pursuant to the principles of law applicable to breach of contract matters.
For clarity, the claims presented by Harrington and the claims presented by Briner in Docket No. CV98-0579272 will be addressed serially below.[3]
 I. LEGAL BASIS FOR DECISION
In reaching its decision in this matter, the court has applied the following principles of law related to the issues raised by the pleadings and the evidence presented at trial:
The interpretation of the terms of a contract presents a matter of law for the court to decide. Empire Paving Inc. v. Milford,,57 Conn. App. 261, 265, ___ A.2d ___ (2000). Whether there was a breach of contract, under a given set of circumstances, presents a question of fact to be resolved by the court in a benchside proceeding. See Paulusv. Lasala, 56 Conn. App. 139, 153, 742 A.2d 379 (1999); see also Bowmanv. 1477 Central Avenue Apartments, Inc., 203 Conn. 246, 257, 524 A.2d 610
(1987).
Insofar as recovery by the plaintiffs is concerned, "[t]he general rule in breach of contract cases is that the award of damages is designed to CT Page 14935 place the injured party, so far as can be done by money, in the same position as that which he would have been in had the contract been performed." Rejouis v. Greenwich Taxi, Inc., 57 Conn. App. 778, 784
___ A.2d ___ (2000); see also Kevin Roche-John Dinkeloo Associatesv. New Haven, 205 Conn. 741, 749, 535 A.2d 1287 (1988). "For a breach of a construction contract involving defective or unfinished construction, damages are measured by computing either (i) the reasonable cost of construction and completion in accordance with the contract, if this is possible and does not involve unreasonable economic waste; or (ii) the difference between the value that the product contracted for would have had and the value of the performance that has been received by the plaintiff, if construction and completion in accordance with the contract would involve unreasonable economic waste. Restatement, 1 Contracts § 346(1)(a), p. 573; see annot., 76 A.L.R.2d 805, 812 § 4. Levesque v. DM Builders, Inc.,170 Conn. 177, 180-81, 365 A.2d 1216 (1976); see also 41 A.L.R.4th 131." (Internal citations omitted; quotation marks omitted.) Kevin Roche-John Dinkeloo Associates v. New Haven, supra, 205 Conn. 749. As to the issue of damages in construction matters, our courts have also noted that "[t]he basic measure of damages for injury to real property is the resultant diminution in its value. . . . Such diminution in value may be determined, however, by the cost of repairing the damage as long as that cost does not exceed the former value of the property and the repairs do not enhance the value of the property over what it was prior to the damage. Id." (Internal citation omitted; quotation marks omitted.) Mattegat v. Klopfenstein,50 Conn. App. 97, 106, 717 A.2d 276 (1998). "The cost of repairs . . . is a proxy for diminution in value caused by damage to property. Because these are, in effect, alternative measures of damages, the plaintiff need not introduce evidence of both diminution in value and cost of repairs." (Footnote omitted.) Willow Springs Condo. Ass'n., Inc. v. 7th BRT Dev.Corp., 245 Conn. 1, 59-60, 717 A.2d 77 (1998). While "[i]t is true that damages for breach of contract are to be measured `as of the date of the breach.' . . . This does not necessarily mean, however, that current cost of repair estimates cannot be evidence of the extent of earlier damage." (Footnote and internal citations omitted). Willow Springs Condo, Ass'n.,Inc. v. 7th BRT Dev. Corp., supra, 245 Conn. 61-62. It has been held particularly appropriate to permit a plaintiff to use the actual cost of repairs as evidence of damages where the cause of action relating to breach of a construction contract does not become apparent until after a defect in the property is detected. Id.
In evaluating the evidence presented, the court followed the applicable rules for assessing witness testimony. "The question of the credibility of witnesses is for the trier to determine. Where testimony is conflicting the trier may choose to believe one version over the other . CT Page 14936 . . as the probative force of the evidence is for the trier to determine." (Internal quotation marks omitted.) State v. Santiago,245 Conn. 301, 318, 715 A.2d 1 (1998); see also State v. Vargas,34 Conn. App. 492, 498, 642 A.2d 47, cert. denied, 230 Conn. 907,644 A.2d 921 (1994);Jacques All Trades Corporation v. Brown,42 Conn. App. 124, 129, 689 A.2d 27 (1996). In addition, the court heeded the axiom that "[i]t is within the province of the [trier of fact] to draw reasonable and logical inferences from the facts proven. . . . The [trier of fact also] may draw reasonable inferences based on other inferences drawn from the evidence presented." (External citations omitted.) Scheirer v. Frenish, Inc., 56 Conn. App. 228, 234, 742 A.2d 808
(1999), cert. denied 252 Conn. 938, 747 (2000). See also State v. Reed,55 Conn. App. 170, 173, 740 A.2d 383, cert. denied 251 Conn. 921,742 A.2d 361 (1999) ("the probative force of the evidence is not diminished because it consists, in whole or in part, of circumstantial evidence rather than direct evidence").
 II. CLAIMS BROUGHT BY JUNE HARRINGTON A. FACTUAL BASIS FOR DECISION
From the evidence presented, the court finds the following facts:
During the middle part of 1993, June Harrington determined that she needed a new roof for the single-family residence she owned at 10 Manor Circle in East Hartford, Connecticut. On September 24, 1993, she entered into a written construction contract provided by the defendant, whom she had engaged to perform the roofing work (Exhibit 1). The document identified the "Contractor's Name, Address, Telephone # and Registration #" as follows: "Carpentry Unlimited, P.O. Box 992, Rocky Hill Ct 06067, 203-241-5040." The contract further described the work to be performed: "1) Remove entire roof shingles from house and take away. Down to wood. 2) Replace with gaf (sic) self-sealing shingles 25 yr. Black. 3)Metal edging on all edges of roof. White. 4) Boots and seal around fire place. 5 yr. Warrantee on workmanship." The contract, signed by Harrington and the defendant, Joseph Grillo, Jr.,[4] specified the standard of work to be performed in replacement of the plaintiff's roof as follows: "All work to be completed in a workmanlike manner according to standard practices." The contract form additionally states: "All material is guaranteed to be as specified." The plaintiff agreed to pay the defendant $3986 upon completion of the work.
At this time, the defendant had been performing general contracting work for the public, using the business name Carpentry Unlimited, for approximately ten years. From 1992 to 1998, he resided at 1607 King Street in Enfield. Neither this street address nor the defendant's town of CT Page 14937 residence was made known to Harrington.
The defendant did not personally do the roofing work at 10 Manor Circle: he contracted with others to perform the construction involved, and occasionally visited the work site. After the work was completed in the fall of 1993, Harrington paid the agreed upon amount to the defendant.
In early 1994, several months after the new roof had been installed, Harrington discovered that water was leaking through the roof into the interior of her house. The leak was located at a point where two angles in the roof came together, forming a "valley" in the roof, and caused minor water damage to a wall in Harrington's dining room. Harrington called the defendant at the number listed on the contract, and he returned to her home to repair the leak and damage without charge.
Thereafter, following a rainstorm in the spring of 1995, Harrington noticed a severe water leak entering into the interior of her home through the dining room ceiling. The leak through the roof, and water seepage into the interior structures, resulted in the following conditions: damage to the insulation in the attic; weakening and loosening of the structures of the dining room ceiling, and the eventual collapse of the ceiling; water damage to the plaintiff's wooden dining room table and several chairs; and additional damage to the structures of the plaintiff's patio area. Harrington unsuccessfully tried to contact the defendant at the telephone number listed on the contract, which she had used to reach him in early 1994.[5] Harrington then secured assistance from others who helped her purchase and place a large tarp over the roof, to avoid further damages.
Harrington placed a timely claim with Liberty Mutual Insurance Company, who provided her homeowner's coverage. Liberty provided compensation for repairs and painting to the ceiling and walls of her dining room, and for the patio ceiling which was also damaged from these events. Despite Harrington's claims, Liberty paid no compensation for defects in the roof or damage to her furniture. Harrington paid the $250 deductible for this claim, leaving her with a total recoupment of $1022.00 for damage to her property.[6]
Harrington promptly contacted James Arsenault, the Building Inspector for the Town of East Hartford. As of 1995, Arseneault, who had valuable experience with the building trades, had worked in this skilled position for approximately fifteen years. His job responsibilities included frequent inspections of roof structures existing in the town, to determine whether the roofs were in compliance with the building codes to which East Hartford adhered. Those codes included standards which were CT Page 14938 promulgated and published by the Connecticut Association of Building Officials (CABO), dealing with one and two family residences. These guidelines, with which Arsenault was well familiar, establish minimum standards for the quality of construction work acceptable to the Town of East Hartford and its residents.
On May 5, 1995, Arsenault went up onto the roof at 10 Manor Circle and inspected the work that had been performed at the defendant's direction. He observed several indications that Harrington's new roof had not been applied according in a workmanlike manner or in accordance with minimum standard roofing practices. According to minimum applicable building standards, including the Building Officials Code Association (BOCA) manual Sections 2305.1, 2305.2 and 2306.1, roofing work completed according to standard practices would have included: the use of saturated felt paper as an underlayment and secondary protective barrier between the interior residential structures and the elements of nature, although no felt paper was applied in the course of the defendant's construction work upon Harrington's house; the use of four nails to secure each full sheet of roofing shingles, although only three nails were used in that aspect of this roofing work; and the use of solid metal flashing in the valley angles of the roof to prevent the entry of rainwater and other precipitation into the house below, although no metal flashing was applied in the course of this roofing work.[7]
On May 23, 1995, in his capacity as the Building Inspector, Arsenault wrote to the defendant at 1607 King Street in Enfield, Connecticut, the address used on the building permit obtained for the roofing work at 10 Manor Circle (Exhibit X). Through this letter, the building inspector advised Grillo of the sub-standard and inadequate conditions that he had found in the roof at that location. Arsenault also wrote directly to Harrington to confirm his identification of the defects noted in the installation of this roof (Exhibit XI). The defendant did not respond to Arsenault's correspondence.
After his inspection, Arsenault recommended removal of the roofing work performed by the defendant, and its replacement with a roof which complied with the requirements of the Town of East Hartford, applied according to building code requirements and the specifications of roofing material manufacturers.[8] Later in May of that year, Harrington entered into written agreement with Julian Quirion, a skilled and experienced building contractor, who agreed to repair the damages to the interior and structures of her house, and to replace her roof (Exhibit VII). She paid Quirion $3420 for the process of removing the roofing installed at the defendant's direction, and the proper installation of underlayment and a new roof surface. The resulting roof provided Harrington with a product that was substantially similar to that for which she had originally CT Page 14939 contracted with Grillo, without the defects in installation that had previously been noted, but without enhancements.
As of the time of trial, Harrington had not yet had her furniture restored to its pre-water damage condition. To repair the water damage to the surface and wood of Harrington's dining room table and two chairs, the finish would have to be stripped from each piece, followed by refinishing. The cost of this restoration work was established by the credible testimony of Richard D. Moir, an experienced furniture restorer working in East Hartford, who was generally familiar with objects like Harrington's. In May of 1995, the reasonable cost of restoring Harrington's furniture would have been $641.90. At the time of trial, in mid-2000, the reasonable cost of repairs would be $791.90.
 B. BREACH OF CONTRACT
The plaintiff Harrington claims that the defendant did not install her roof in a workmanlike manner, according to standard practices, and that the work was not in compliance with the applicable building codes, thereby constituting a breach of the original contract. The defendant counters that the roof was properly and adequately installed at 10 Manor Circle, and that Harrington chose, for unspecified reasons, to have another new roof constructed in lieu of that provided through the services of Construction Unlimited. The court finds this matter in favor of the plaintiff Harrington.
The evidence presented in this case supports the court's conclusion that the roofing construction work performed at Harrington's home in 1993 was not done in a workmanlike manner or according to standard practices, constituting a breach of contract. "The contract requires that the work be done in a skillful, competent and workmanlike manner. This the defendant has failed to do." Pagano v. Maniscalco, Superior Court, judicial district of Ansonia/Milford at Ansonia, Docket No. CV92-040975 S (June 2, 1994, Curran, J.).
The court found Arsenault to be fully credible on the subjects of the quality of roofing work performed by the defendant, the nature and extent of applicable building codes, and the materials and techniques used in installing the roof and axillary structures at 73 Westerly Terrace. Arseneault had consistently supplemented his work experience through attendance at municipal and state level training programs and seminars on building related subjects. There was no evidence from which the court could conclude anything other than that Arsenault was skilled and experienced in the process of inspecting and evaluating construction work done on residential structures. He had retained and provided for examination, during trial, his Town of East Hartford files which CT Page 14940 reflected the work performed and results obtained when he personally inspected Harrington's roof in May of 1995. Furthermore, the court concludes that Arsenault had performed his inspection of the roof at 10 Manor Circle in an objective, even-handed manner on behalf of the Town of East Hartford. He demonstrated no specific interest in the plaintiff, Harrington, nor any bias or prejudice against the defendant.
Accordingly, the court credits and accepts Arsenault's opinion that standard building practices requires the use of 15 lb. felt paper beneath the shingles that are applied in construction of a residential roof, both to protect the shingles and to provide secondary protection to the structures of the house beneath the roof.[9] Although Arsenault acknowledged that a few roofing contractors skip using felt paper, without the use of this protective layer, rain water again is less likely to run off the roof, and more likely to leak into the house below if the proper and standard practice is followed, and felt paper is used upon the roof. The court further credits and accepts Arsenault's opinion that workmanlike protocols and standard building practices in 1993 required the use of proper nailing techniques for affixing shingle sheets to the roofing structures, as without the use of this protective technique, rain water is again more likely to leak into the house below. The court credits and accepts Arsenault's findings, upon inspection of the roofing work at issue, that the defendant used neither felt paper nor proper nailing techniques in the installation of Harrington's roof, and that he thereby breached that provision of the contract which required his work to be completed "in a workmanlike manner and according to standard practices." The court further credits and accepts Arsenault's opinion that standard building practices in 1993 required the use of flashing in the valley areas of a residential roof. Without the use of flashing and proper nailing techniques, rain water is less likely to run off the roof, and more likely to leak into the house below. As the defendant did not use flashing or proper nailing techniques in the installation of Harrington's roof, he again breached that provision of the contract which required his work to be completed "in a workmanlike manner and according to standard practices."
From all of this evidence, the court concludes that the defendant's breach of his contractual obligation to Harrington, and his failure to comply with the noted workmanlike practices and BOCA standards, caused the leakage of rain water to penetrate the structures of her house, to damage the insulation in her attic in the area of the leak, to cause damage and destruction of the ceiling structures in her dining room and patio ceiling, and to damage the finish on the dining room table and the arms of the two chairs that were exposed to this leak. Further, the court finds that Harrington is entitled to compensation for the damages she suffered when the roof installed by the defendants leaked water that CT Page 14941 caused damage to the interior of her house. The defendant was aware of the potential for damage to the interior of Harrington's home, both because of his acknowledgment that a purpose of properly using materials to reroof a house was to prevent water from entering the residence, and because of his assumption that adequate felt paper had been delivered to the Harrington site and used in the roofing work at that location.
 III. CLAIMS BROUGHT BY MILDRED BRINER A. FACTUAL BASIS FOR DECISION
From the evidence presented, the court finds the following additional facts:
In the latter part of 1993, Mildred Briner determined that she needed a new roof and additional construction work for the single-family residence she then owned and occupied at 73 Westerly Terrace in East Hartford, Connecticut. On October 5, 1993, she entered into a written construction contract provided by the defendant, whom she had engaged to perform roofing work and other construction projects at that location (Exhibit XIII). The contract identified the "Contractor's Name, Address, Telephone # and Registration #" as follows: "Carpentry Unlimited, P.O. Box 992, Rocky Hill Ct 06067, 203-241-5040." The contract further described the work to be performed: "1) Remove old Roof on Main house only and Replace with self sealing shingles. 25 yr. Drip edging on all edges of Roof White also Felt Paper. 2) Cover walls with Blue Board Insulator and Cover with 4/4 Vinyl siding. 3) Custom cover all Trim, facia, soffit Casings, sills and New Vents. 4) Cover Porch and Carport ceiling and Apply gutters and leader on Front of house only/use light blocks. Leave Broom Clean. 5) Labor, Material and Taxes included."
The contract, signed by Briner and the defendant, Joseph Grillo, Jr., specified the standard of work to be performed in replacement of the plaintiff's roof as follows: "All work to be completed in a workmanlike manner according to standard practices." The contract form additionally states: "All material is guaranteed to be as specified." The plaintiff agreed to make interim deposit payments to the defendant, and to pay him an additional $3,086 upon completion of the work. The total figure for the entirety of the work to be performed for Briner was $9086.
At this time, the defendant had been performing general contracting work for the public, using the business name Carpentry Unlimited, for approximately ten years. From 1992 to 1998, he resided at 1607 King Street in Enfield. Neither this street address nor the defendant's town of residence was made known to Briner. CT Page 14942
The defendant did not personally do the roofing work at 73 Westerly Terrace: he contracted with others to perform the construction involved, and occasionally visited the work site. After the work was completed in the fall of 1993, Briner completed her payment to the defendant in the agreed upon amount.
In the spring of 1995, Briner was contacted by Harrington, who was her friend and neighbor. Harrington explained that she had sustained damage to the ceilings and structures of her residence at 10 Manor Circle, where the defendant had performed roofing work. When Briner visited Harrington and viewed the damaged ceiling, she became fearful concerning the sufficiency of her the roof on her own house, and the potential for future harm, knowing that they had used the same roofing contractor.
While Briner had not located any leaks into the interior of her home, she determined that the quality of the defendant's work at her house was subject to question. She therefore contacted James Arsenault, the building inspector for the Town of East Hartford, in an effort to learn whether her roof was in compliance with the Town's expectations.[10]
On May 8, 1995, Arsenault went up onto the roof at 73 Westerly Terrace and inspected the work performed at the defendant's direction. He observed several indications that Briner's new roof had not been applied according in a workmanlike manner or m accordance with minimum standard roofing practices. According to minimum applicable building standards, including the BOCA manual Sections 2305.1 and 2305.3, roofing work completed according to standard practices would have included: the use of saturated felt paper as an underlayment and secondary protective barrier between the interior residential structures and the elements of nature, although no felt paper was applied in the course of the defendant's construction work upon Briner's house; and the use of four nails to secure each full sheet of roofing shingles, although only three nails were used in that aspect of this roofing work.
On May 23, 1995, in his capacity as the Building Inspector, Arsenault wrote directly to Briner to confirm his identification of the faults in installation of this roof (Exhibit XII).
After his inspection, Arsenault recommended removal of the roofing work performed by the defendant, and its replacement with a roof which complied with the requirements of the Town of East Hartford, applied according to building code requirements and the specifications of roofing material manufacturers. Briner unsuccessfully tried to contact the defendant at the telephone number listed on the contract, calling him several times to advise him of the need for these reconstruction services. However, that phone number was no longer providing service for the defendant or for CT Page 14943 Carpentry Unlimited. She accordingly began the process of locating another roofing contractor.
In July of 1995, Briner contacted Dennis Miller, of Rainbow Contractors. At that time, Miller had been engaged in the roofing and siding business for over twenty years. He inspected the roofing structures present on the residence at 73 Westerly Terrace, and noted that while they appeared to be relatively new, the chimney flashing had been improperly installed. Miller agreed to remove the present roof work, and to repair and replace it for $2,370.12 (Exhibit VIII). Briner paid Miller this amount for the process of removing the roofing installed at the defendant's direction, and the installation of underlayment and a new roof surface. The resulting roof provided Briner with a product that was substantially similar to that for which she had originally contracted with Grillo, without the defects in installation that had previously been noted, but without enhancements.
 B. BREACH OF CONTRACT
The plaintiff Briner claims that the defendant did not install her roof in a workmanlike manner, according to standard practices, and that the work was not in compliance with the applicable building codes, thereby constituting a breach of the original contract. The defendant counters that the roof was properly and adequate installed at 73 Westerly Terrace, and that Briner chose, for unspecified reasons, to have another new roof constructed in lieu of that provided through the services of Construction Unlimited. The court finds this matter in favor of the plaintiff Harrington.
The evidence presented in this case supports the court's conclusion that the roofing construction work performed at Briner's home in 1993 not done in workmanlike manner or according to standard practices, constituting a breach of contract. "The contract requires that the work be done in a skillful, competent and workmanlike manner. This the defendant has failed to do." Pagano v. Maniscalco, supra, Superior Court, Docket No. CV92-040975 S.
The court found Arsenault to be fully credible on the subjects of the quality of roofing work performed by the defendant, the nature and extent of applicable building codes, and the materials and techniques used in installing the roof and axillary structures at 10 Manor Circle. There was no evidence from which the court could conclude anything other than that Arsenault was skilled and experienced in the process of inspecting and evaluating construction work done on residential structures, that he had consistently supplemented his work experience through attendance at municipal and state level training programs and seminars. He had retained CT Page 14944 and provided for examination, during trial, his Town of East Hartford files which reflected the work performed and results obtained when he personally inspected Briner's roof in May of 1995. Furthermore, the court concludes that Arsenault had performed his inspection in an objective, even-handed manner on behalf of the Town of East Hartford, not in the interest of the plaintiff Harrington nor because of any bias against the defendant.
Accordingly, the court credits and accepts Arsenault's opinion that standard building practices requires the use of 15 lb. felt paper beneath the shingles that are applied in construction of a residential roof, both to protect the shingles and to provide secondary protection to the structures of the house beneath the roof.[11] Although Arsenault acknowledged that a few roofing contractors skip using felt paper, without the use of this protective layer, rain water again is less likely to run off the roof, and more likely to leak into the house below if the proper and standard practice is followed, and felt paper is used upon the roof. The court further credits and accepts Arsenault's opinion that workmanlike protocols and standard building practices in 1993 required. the use of proper nailing techniques for affixing shingle sheets to the roofing structures, as without the use of this protective technique, rain water is more likely to leak into the house below. The court credits and accepts Arsenault's findings, upon inspection of the roofing work at issue, that the defendant used neither felt paper nor proper nailing techniques in the installation of Briner's roof, and that he thereby breached that provision of the contract which required his work to be completed "in a workmanlike manner and according to standard practices." In addition, The court credits and accepts Miller's opinion that standard building practices in 1993 required the use of flashing in the areas of a residential roof surrounding a chimney. Without the use of flashing and proper nailing techniques, rain water is less likely to run off the roof, and more likely to leak into the house below. As the defendant did not use flashing techniques in the installation of Briner's roof, he again breached that provision of the contract which required his work to be completed "in a workmanlike manner and according to standard practices."
The court finds that the defendant breached his contract with Briner, resulting in direct damage to this plaintiff in the sum of $2370.12, the cost incurred to have her house reroofed. Briner demonstrated no other cost of repair or other element of damages for the conditions caused by the defendant's work.
 III. CLAIMS OF FRAUDULENT MISREPRESENSATION
In Counts Two and Four of the Amended Complaint, the plaintiffs claim that the defendant fraudulently misrepresented the nature and extent of CT Page 14945 the construction work he was to perform upon their residences. It is well acknowledged that "[t]he essential elements of an action in fraud . . . are: (1) that a false representation was made as a statement of fact; (2) that it was untrue and known to be untrue by the party making it; (3) that it was made to induce the other party to act on it; and (4) that the latter did so act on it to his injury." (Citations omitted; quotation marks omitted; footnote omitted; emphasis added.) Kilduff v. Adams,Inc., 219 Conn. 314, 329, 593 A.2d 478 (1991). The plaintiffs' burden of proof on this issue differs from that "preponderance of the evidence" standard required to prove the breach of contract allegations. "It is well established that common law fraud must be proven by a higher standard than a fair preponderance of the evidence." Kilduff v. Adams,Inc., supra, 219 Conn. 327. A proponent must establish fraudulent misrepresentation by either "`clear and satisfactory evidence' or "clear, precise, and unequivocal evidence.' Our Supreme Court has described the requisite burden of proof in both manners. BarbaraWeisman, Trustee v. Kaspar, 233 Conn. 531, 540, 661 A.2d 530
(1995); Kilduff v. Adams, Inc. [supra, 219 Conn. 327-28]; J. FrederickScholes Agency v. Mitchell, 191 Conn. 353, 358, 464 A.2d 795 (1983)."Meyers v. Cornwell Quality Tools, Inc., 41 Conn. App. 19, 34, 674 A.2d 444
(1996).
Upon consideration of the evidence presented in this matter, the court finds that the plaintiffs have failed to meet their burden of proving the essential elements of fraudulent misrepresentation in this case. The facts as established do not support the inference that the defendant intended to provide substandard work, or that he intended to mislead Harrington or Briner into contracting for work that would be inadequate and defective. The evidence does not support the inference that the defendant knew, upon contracting with the plaintiffs, that he would not provide them with roofing construction that was performed in a workmanlike manner, nor that he made a false representation for the purpose of inducing either plaintiff to engage his services. See Kilduff v. Adams,Inc., 219 Conn. 314, 329, 593 A.2d 478 (1991). The court has noted the evidence which indicates that the defendant arranged for the application of the requisite felt underlayment to both plaintiffs' roofs, and that he directed such materials to be delivered to the job site at 10 Manor Circle. Whether this did application did not occur due to inadvertence, mistake, or intention cannot be discerned from the evidence: fraudulent representation, even on this issue, was not established by either "clear and satisfactory evidence" or "clear, precise, and unequivocal evidence" as is required for the proponent to prevail in such matters. Meyers v.Cornwell Quality Tools, Inc., supra, 41 Conn. App. 34.
There was, in sum, insufficient evidence from which the court could reasonably find that the plaintiffs had met their burden of proving each CT Page 14946 of the requisite elements of fraudulent misrepresentation in this matter. Accordingly, the court finds Count Two and Count Four in favor of the defendant.
 IV. SPECIAL DEFENSE
As a special defense to the allegations brought on Harrington's behalf the defendant claims that she "assigned and subrogated her claim to Liberty Mutual Insurance Company" and that she is therefor barred from pursuing recovery on her own behalf. Answer and Special Defenses dated August 31, 1998. The court finds this defense inapposite to the present action, and therefore unavailing to the defendant.
The defendant seems to promote a now abandoned tenet of equitable subrogation legal theory, which might have focused upon the amounts paid by Liberty to its insured, and limited Liberty's right to pursue a claim against Construction Unlimited as the liable party.[12] In this matter, however, Harrington has carefully limited her claims for recover against the defendant to those loss amounts which were not paid by her homeowner's carrier. Through her presentation of evidence related to claims under the Liberty homeowner's policy, Harrington has expressly acknowledged that she is neither seeking nor entitled to recover the amounts which Liberty has already paid to her in reimbursement of her losses. The evidence clearly reflects, however, that Harrington sustained a number of areas of loss, as the result of the defendant's breach of his contract with her, that were not the subject of insurance payments. These amounts included the cost of repairing the damaged furniture from Harrington's dining room, reimbursement of the amounts expended for the defendant's unsatisfactory work or the cost of the roofing necessary to restore her residence to a reasonable condition, and the amount of her "deductible." Under these circumstances, notwithstanding the defendant's vigorous argument, there is no extant principle of law which precludes this plaintiff from pursuing an action for recovery of the amounts designated by Harrington.
The subrogation of Harrington's claims for the amounts paid by Liberty was pursued through the matter of Liberty Mutual Insurance Co. v.Carpentry Unlimited, Docket No. CV97-0570768. In that action, as noted, the insurer sought only to recover the amounts it actually paid to Harrington as the result of the incidents at issue. The pursuit of these separate actions against the defendant is consistent with current principles of subrogation. "As now applied, the doctrine of equitable subrogation is broad enough to include every instance in which one person, not acting as a mere volunteer or intruder, pays a debt for which another is primarily liable, and which in equity and good conscience should have been discharged by the latter. . . . Subrogation is a highly CT Page 14947 favored doctrine . . . which courts should be inclined to extend rather than restrict." (Citations and quotation marks omitted.) Westchester FireIns. Co. v. Allstate Ins. Co., 236 Conn. 362, 371, 672 A.2d 939 (1996).
There is no evidence presented in this matter from which the court could reasonably conclude that Harrington has taken undue advantage of her rights against the defendant, or that she has abused the subrogation process by claiming more from the defendant than he should be required to pay at law or in equity. Accordingly, the special defense must fall.
 V. DAMAGES
Having found the breach of contract allegations in favor of the plaintiffs, the court turns next to the issue of such damages as are fairly and justly due to Harrington and to Briner. In addition to costs and other unspecified relief, Harrington seeks "damages in the amount of Four Thousand Eight Hundred Seventy Seven and 90/100 ($4,877.90) Dollars." Plaintiffs' Post Trial Memorandum dated July 28, 2000, p. 5.[13] In addition to costs and other unspecified relief, "Briner seeks compensation for such damages from the defendant in the amount of Two Thousand Three Hundred Seventy and 12/100 ($2,370.12) dollars." Id.
 A. MITIGATION OF DAMAGES
The defendant claims that even if he is liable for breach of his contract with either plaintiff both Harrington and Briner failed to utilize the warrantee on workmanship that was a part of his agreement with these homeowners, and that they therefore failed to mitigate their damages. Specifically, he argues that because neither Harrington nor Briner elected to have him repair or replace the roofs upon their houses, he should not be liable for the costs incurred by the employment of third parties to perform that work. The court finds this issue in favor of the plaintiffs.
Generally, in an action for breach of contract, as noted by the defendant, the injured part is under a duty to use reasonable care to mitigate damages. The defendant, however, bears the burden of proving a plaintiff's failure to mitigate her damages. Keans v. Bocciarelli,35 Conn. App. 239, 243, 645 A.2d 1029, cert. denied, 231 Conn. 934,650 A.2d 172 (1994). "`To claim successfully that the plaintiff failed to mitigate damages, the defendant "must show that the injured party failed to take reasonable action to lessen the damages; that the damages were in fact enhanced by such failure; and that the damages which could have been avoided can be measured with reasonable certainty.'" (Citation omitted, emphasis added.) Preston v. Keith, 217 Conn. 12, 22, 584 A.2d 439
CT Page 14948 (1991). The rule regarding who bears the burden of proving mitigation of damages and the rationale for the rule are the same in contract and negligence actions. Lynch v. Granby Holdings, Inc., 37 Conn. App. 846,851, 658 A.2d 592 (1995); see also Preston v. Keith, supra,20 Conn. App. 20. "A defendant claiming that the plaintiff has failed to mitigate damages seeks to be benefitted by a particular matter of fact, and he should, therefore, prove the matter alleged by him. The rule requires him to prove an affirmative fact, whereas the opposite rule would call upon the plaintiff to prove a negative, and therefore the proof should come from the defendant. He is the wrongdoer, and presumptions between him and the person wronged should be made in favor of the latter. For this reason, therefore, the onus must in all such cases be upon the defendant. 1 T. Sedgwick, Damages (9th Ed. 1912) 227, p. 448." (Citations omitted; quotation marks omitted.) Lynch v. GranbyHoldings, Inc., supra, 37 Conn. App. 851.
The defendant has failed to provide the court with any legal authority for his proposition that because he provided a warrantee or guarantee to both Harrington and Briner, they were required to use Construction Unlimited as the sole or primary provider of repair and restoration services. The court accepts the argument presented by the plaintiffs which, consistent with the evidence, establishes that even if the plaintiffs had a duty to utilize the defendant for replacement of their defective roof structures, they made reasonable, but unsuccessful, efforts to contact him. The defendant's argument supposes that the plaintiffs were aware that Grillo could be reached in Enfield, or in a place other than Rocky Hill during the time periods in question. While the plaintiffs remained at their same locations through the relevant years, the defendant apparently ceased operations at his Rocky Hill office, discontinued his Rocky Hill phone number, and made himself otherwise unavailable to all except those who knew he resided in Enfield. This knowledge is not reasonably attributable to the consumers June Harrington or Mildred Briner.
The defendant further argues that the plaintiffs should and could have done something more to promote their recovery, without economic efficiency. Defendant's Brief dated July 28, 2000, p. 11. The defendant valiantly submits that "Connecticut law requires a reasonable effort on plaintiffs (sic) part to allow defendant to correct any alleged problem, particularly when it is known that the work is still under warrantee." Id., p. 12. While citing no pertinent legal authority for this proposition, the defendant concedes that "[w]hat constitutes reasonable efforts is a question of fact for the trier." Id., p. 11. Under the circumstances of this case, where both plaintiffs were warned by the Building Inspector of the inadequate installation of the roofs upon each their houses, this court finds that it would be unreasonable to require CT Page 14949 or even to expect them to rely upon the defendant, who already had two strikes against him, to come back and provide replacement roofs for them.
The court finds that the defendant has failed to establish, by sufficient and credible evidence, that any specific measure of the plaintiffs' losses were caused or enhanced by their failure to mitigate the damages.[14] Preston v. Keith, supra, 217 Conn. 22. Additionally, the defendant has failed to prove, by a preponderance of the evidence, the amount of damages that thereby could have been avoided. Id. Accordingly, the court declines the opportunity to ascribe sufficient weight to this aspect of the defendant's argument to enable him to prevail on this issue as to either plaintiff.
 B. CALCULATION OF DAMAGES
In assessing damages in this contract action, the court has applied the general rule "that the award of damages is designed to place the injured party, so far as can be done by money, in the same position as that which he would have been in had the contract been performed. . . . For breach of a construction contract by the contractor, damages may either be (1) the cost of completion of construction or repair, if that does not involve unreasonable economic waste, or (2) diminution in value of the product. . . . Cost of repair is a proper element in determination of diminution of value." (Citations and internal quotation marks omitted.)Pelletier v. Pelletier Development Co., Docker No. CV 94-0463671S, judicial district of Hartford/New Britain at New Britain (Mar. 14, 1996,Fineberg, J.); see also Willow Springs Condo. Ass'n., Inc. v. 7th BRTDev. Corp., supra, 245 Conn. 61-62.
As to the issue of damages, our courts have held that "[w]hen proximate cause exists for damage to real estate, `[t]he basic measure of damages for injury to real property is the resultant diminution in its value.'Ferri v. Pyramid Construction Co., 186 Conn. 682, 689, 443 A.2d 478
(1982). Such diminution in value may be determined, however, by the cost of repairing the damage as long as that cost does not exceed the former value of the property and the repairs do not enhance the value of the property over what it was prior to the damage. Id." Mattegat v.Klopfenstein, 50 Conn. App. 97, 106, 717 A.2d 276 (1998). "The cost of repairs . . . is a proxy for diminution in value caused by damage to property. Because these are, in effect, alternative measures of damages, the plaintiff need not introduce evidence of both diminution in value and cost of repairs." (Footnote omitted) Willow Springs Condo. Ass'n., Inc.v. 7th BRT Dev. Corp., supra, 245 Conn. 59-60.[15] Current cost of repair estimates can provide valid evidence of the extent of earlier damage. Id., 61. Where a damaged or defective roof is concerned, costs CT Page 14950 incurred in replacement may also serve as a valid measure of the direct damage sustained by the homeowner. See, e.g., Vorwerk v. Tinto, Superior Court, Docket No. CV 96-0472908-S (July 15, 1998, Kremski, J.T.R.). Applying the principles of damage calculation as set forth above, the court has focused in this case upon the designation of lawful damages which will provide repair or replacement costs, and which will place Harrington and Briner, as the injured parties, in the same position as that which they would have been in had the defendant's contracts been properly performed, "so far as can be done by money." Rejouis v. GreenwichTaxi, Inc., 57 Conn. App. 778, 784.
Accordingly, the court finds that the defendant's breach of his contract with Harrington resulting in direct damage to this plaintiff in the sum of $3986, the amount she paid to the defendant for the provision of his inadequate roofing construction, which caused her to incur the need to have a replacement, adequate roof installed at 10 Manor Circle; plus $791.90, the current reasonable cost for repair of her damaged furniture; and plus $250.00, the amount Harrington was required to pay as a deductible against the amount paid by her homeowner's insurance. The total damages sustained by Harrington thus equal the sum of $5027.90. The court further finds that this figure appropriately represents cost of repairing the damage to the property and the cost of placing Harrington in the position she would have been in had the contract been properly performed, and that these damages do not enhance the value of the property over what it was prior to the damage caused by the breach of contract. See Rejouis v. Greenwich Taxi, Inc., supra, 57 Conn. App. 784; Mattegatv. Klopfenstein, supra, 50 Conn. App. 97. Harrington demonstrated no other cost of repair or other element of damages for the conditions caused by the defendant's work.
The court finds that the defendant's breach of his contract with Briner resulting in direct damage to this plaintiff in the sum of $2370.12, the cost incurred to have a replacement, adequate roof installed at 73 Westerly Terrace. The court further finds that this figure appropriately represents cost of repairing the damage to the property and the cost of placing Briner in the position she would have been in had the contract with the defendant been properly performed, and that these damages do not enhance the value of her property over what it was prior to the breach. See Rejouis v. Greenwich Taxi, Inc., supra, 57 Conn. App. 784; Mattegatv. Klopfenstein, supra, 50 Conn. App. 97. Briner demonstrated no other cost of repair or other element of damages for the conditions caused by the defendant's work.
 VI. ORDERS WHEREFORE, the court having found this matter in favor of the plaintiff CT Page 14951 June Harrington on the issue of breach of contract, judgment is hereby rendered in her favor on and may enter for the plaintiff and against the defendant on Count One of the Amended Complaint. The total amount of the judgment as to the plaintiff, June Harrington, is $5027.90, plus court costs, payable by the defendant.
And furthermore, the court having found this matter in favor of the plaintiff Mildred Briner on the issue of breach of contract, judgment is hereby rendered in her favor and may enter in her favor and against the defendant on Count Three of the Amended Complaint. The total amount of the judgment as to the plaintiff Mildred Briner, is $2370.12, plus court costs, payable by the defendant.
And furthermore, the court having found this matter in favor of the defendant, Joseph Grillo d/b/a Carpentry Unlimited, on the issues of fraudulent misrepresentation, judgment is hereby rendered in his favor and may enter against the plaintiff June Harrington on Count Two of the Amended Complaint, and judgment is hereby rendered in his favor and may enter against the plaintiff Mildred Briner on Count Four of the Amended Complaint, without costs to the defendant.
BY THE COURT,
N. Rubinow, J.