## WESTCHESTER FIRE INSURANCE COMPANY v. ALLSTATE INSURANCE COMPANY
### (15158)

Peters, C. J., and Callahan, Borden, Norcott and Palmer, Js.

---

Argued November 1, 1995—decision released March 19, 1996

*Joan Keating-McKeon*, with whom, on the brief, was *Joseph A. Hourihan*, for the appellant (plaintiff).

*Anita M. Varunes*, for the appellee (defendant).

*Kurt D. Koehler* and *William F. Gallagher* filed a brief for the Connecticut Trial Lawyers Association as amicus curiae.

BORDEN, J. The dispositive issue in this appeal is whether an uninsured motorist insurance carrier that has paid underinsured motorist benefits to its insured may bring a subrogation action against the tortfeasor's liability insurer, which, the uninsured motorist carrier contends, wrongfully denied coverage of the insured's claim against the tortfeasor. The plaintiff, Westchester Fire Insurance Company, also known as Crum and For-

ster Personal Insurance (Crum and Forster), appeals[1] from the judgment of the trial court granting the motion of the defendant, Allstate Insurance Company (Allstate), to strike Crum and Forster's complaint. Crum and Forster claims that: (1) this case is distinguishable from our decision in *Berlinski* v. *Ovellette*, 164 Conn. 482, 494, 325 A.2d 239 (1973), in which we held that an uninsured motorist carrier may not be subrogated to its insured's claim against an uninsured tortfeasor; and (2) if *Berlinski* controls, we should overrule it. We agree that *Berlinski* should be overruled, and we therefore reverse the judgment of the trial court.[2]

The complaint alleged the following facts, which we assume to be true for purposes of the motion to strike. On September 12, 1989, William J. Peck, Jr., was injured when the automobile he was driving was struck by an automobile owned by Gilbert A. Knight and operated by Robert A. English. At the time of the accident, English was employed by Vendors, Inc. (Vendors), and was acting as its agent in the course of and within the scope of his employment. Knight's automobile was insured by Aetna Casualty and Surety Company (Aetna), which provided liability coverage in the amount of $100,000. Aetna paid the full amount of its liability coverage to

[1] Crum and Forster appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

[2] Allstate claims, as an alternate ground for affirmance of the trial court's judgment pursuant to Practice Book § 4066, that this action is barred by the statute of limitations. Allstate did not make this claim in the trial court pursuant to its motion to strike. Thus, because in this case the question of the statute of limitations would necessarily involve factual questions outside the allegations of the complaint, determination of those questions in the context of a motion to strike, either in the trial court or in this court, would be inappropriate. We therefore do not consider Allstate's alternate ground of affirmance. We need not decide, moreover, whether the defense of the statute of limitations may be considered on a motion to strike when the complaint does contain all of the facts necessary for the proper determination of the defense.

Peck in settlement of his claim against Knight. Vendors was insured by Allstate under a commercial policy of automobile insurance. After Peck had received the full amount of liability coverage available under Knight's policy with Aetna, Peck made demand for payment under the liability coverage in Vendors' policy with Allstate. Allstate denied coverage under Vendors' policy because the automobile operated by English was not listed on Vendors' policy as a covered vehicle. Having exhausted all of the available liability policies, Peck then pursued his own underinsured motorist coverage with Crum and Forster. During arbitration proceedings, Crum and Forster settled Peck's underinsured motorist claim for $72,500.

Crum and Forster then instituted this subrogation action against Allstate, claiming that Allstate had improperly denied benefits that were due Peck under Vendors' liability policy with Allstate.[3] Crum and Forster alleged that, because General Statutes § 38a-336 (b)[4] requires payment of underinsured motorist benefits only after the limits of all applicable liability policies have been exhausted, if Allstate had properly made payment on Peck's claim against Vendors, Crum and Forster would not have been required to pay Peck's underinsured motorist claim against it. Alleging that Allstate had been unjustly enriched by the amount of the payment to Peck, Crum and Forster sought to recover that amount, plus attorney's fees and the cost of investigation.

[3] For purposes of this appeal, we will assume, without deciding, that, as Crum and Forster claims, Allstate's denial of coverage under Vendors' policy was improper.

[4] General Statutes § 38a-336 (formerly § 38-175c) provides in relevant part: "Uninsured and underinsured motorist coverage. . . .

"(b) An insurance company shall be obligated to make payment to its insured up to the limits of the policy's uninsured and underinsured motorist coverage after the limits of liability under all bodily injury liability bonds or insurance policies applicable at the time of the accident have been exhausted by payment of judgments or settlements . . . ."

Allstate moved to strike[5] Crum and Forster's complaint, arguing that the cause of action involved an assignment of a personal injury action, which is impermissible under Connecticut law. The trial court granted Allstate's motion on the ground that *Berlinski* v. *Ouellette*, supra, 164 Conn. 482, which invalidated subrogation actions by providers of uninsured motorist benefits, was controlling authority. Crum and Forster then moved the trial court to render judgment on the motion to strike so that it could bring this appeal. The court rendered judgment and this appeal followed.

We first address Crum and Forster's claim that, in granting Allstate's motion to strike, the trial court improperly relied on *Berlinski* as controlling authority because, according to Crum and Forster, *Berlinski* is distinguishable. Specifically, Crum and Forster argues that, unlike *Berlinski*, in which the uninsured motorist carrier stepped into the shoes of its insured to bring an action against the uninsured tortfeasor in order to recover moneys that the uninsured motorist carrier had paid to its insured, in this case the insurer is standing not in the shoes of its insured, Peck, but rather in the shoes of English, the tortfeasor. Crum and Forster argues that it was injured by Allstate's wrongful denial of coverage to English, in light of Allstate's contract with English's employer, Vendors. It is the denial of coverage to English, Crum and Forster claims, that triggered this action. Although we agree that Allstate's denial of coverage to English underlies Crum and Forster's claim, we are not persuaded that this case is distinguishable from *Berlinski*.

In *Berlinski*, the insurance company paid uninsured motorist benefits to its own insured, and then sought

---

[5] Practice Book § 152 provides in relevant part: "Whenever any party wishes to contest (1) the legal sufficiency of the allegations of any complaint, counterclaim or cross claim, or of any one or more counts thereof, to state a claim upon which relief can be granted . . . that party may do so by filing a motion to strike the contested pleading or part thereof. . . ."

to join in its insured's action against the tortfeasor. Id., 484. In that case, it was the tortfeasor's wrongdoing that resulted in the insurer's obligation to pay uninsured motorist benefits, and the insurer therein attempted to prevent the tortfeasor from being unjustly enriched by being relieved of the duty to compensate the injured party.

In the present case, Crum and Forster's obligation to pay underinsured motorist benefits to its insured arose when Allstate refused to cover Vendors under its liability policy. Thus, although Allstate's denial of coverage caused Crum and Forster's loss by triggering its obligation to pay Peck, it is Crum and Forster's payment to Peck, not Allstate's denial of coverage to Vendors, that gives rise to Crum and Forster's subrogation claim.

Thus, although the party in the wrong may differ between the two cases, from the perspective of the uninsured motorist carrier, there is no distinction. In each case, the uninsured motorist carrier has paid benefits that were allegedly properly payable by another party. In both cases, the uninsured motorist carrier is stepping into the shoes of the party it paid in order to recover the payments that it made, and thus to prevent the unjust enrichment of the party whose debt it paid. From the viewpoint of the subrogee, therefore, this case is not distinguishable from *Berlinski*.

Furthermore, the reasoning of *Berlinski* equated the subrogation process, by which the insurer would have become entitled to sue for the damages resulting from its insured's personal injuries, with an assignment of its insured's cause of action. That assignment, we concluded, carried with it the kind of social evils associated with champerty. See id., 486. We perceive no reason why, if *Berlinski* remains as our law, the same equivalency would not flow from the subrogation involved in this case. In *Berlinski* v. *Ovellette*, supra, 164 Conn.

489, we concluded that, in the context of an uninsured motorist claim, a subrogation action by an insurer against the party responsible for the loss was indistinguishable from an assignment of a personal injury action, which has long been against public policy. See *Iseli Co.* v. *Connecticut Light & Power Co.*, 211 Conn. 133, 136, 558 A.2d 966 (1989); *Whitaker* v. *Gavit*, 18 Conn. 522, 526 (1847). In the absence of a decision overruling *Berlinski*, therefore, that rule governs the present case, and Crum and Forster may not maintain this action against Allstate.

We therefore turn to Crum and Forster's argument that we should overrule *Berlinski*. "Stare decisis, although not an end in itself, serves the important function of preserving stability and certainty in the law. Accordingly, a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it. Maltbie, Conn. App. Proc., p. 226." (Internal quotation marks omitted.) *Kluttz* v. *Howard*, 228 Conn. 401, 406, 636 A.2d 816 (1994). We are persuaded that this is such a case.

When we decided *Berlinski*, uninsured motorist coverage and insurance provisions for payment of medical expenses were relatively new phenomena and we looked to other jurisdictions for guidance on this issue. We relied on *Hardware Dealers Mutual Fire Ins. Co.* v. *Krueger*, 486 P.2d 737 (Okla. 1971) (*Hardware Dealers*), in which, after making payment of medical expense benefits to its insured, the insurer attempted, in accordance with a subrogation clause in the insurance policy, to sue the tortfeasor in order to recover the payments it had made to its insured. In that case, the Oklahoma Supreme Court determined that the subrogation "provisions merely attempt to change (by transfer) the party entitled to enforce the personal injury claim of [the insured] against the defendant tortfeasor. As applied to the present circumstances there is nothing

distinguishable between the effect of subrogation and assignment. While subrogation and assignment have certain technical differences, each operates to transfer from one person to another a cause of action against a third person, and the reasons of policy which make certain causes of action nonassignable would seem to operate as forcefully against the transfer of such causes of action by subrogation." Id., 738. Quoting that language in *Berlinski*, we concluded similarly that "[s]ubrogation, where applied in a manner to transfer the right to designate counsel, to initiate, to settle and generally to control a suit, is not practically different from assignment." *Berlinski* v. *Ovellette*, supra, 164 Conn. 489.

Three months after we decided *Berlinski*, the Oklahoma Supreme Court, in *Aetna Casualty & Surety Co.* v. *Associates Transports, Inc.*, 512 P.2d 137, 141 (Okla. 1973), overruled *Hardware Dealers*, because it recognized that there was a cognizable difference between assignment and subrogation. The "plaintiff's subrogation rights came into existence pursuant to the contract of insurance which existed prior to the time the assured's cause of action arose, rather than pursuant to an assignment made after the cause of action arose." Id., 140. " 'Under the common law the assignment of right of action in certain classes of tort was condemned. Champerty was penalized under a public policy which sought to restrain "the traffic of merchandising in quarrels, of huckstering in litigious discord". . . . [T]he reasons in which the ancient doctrine was rooted have not been considered applicable to indemnity insurance. Distinction between the two kinds of cases is obvious. In one there is an assignment, after loss, to a third party, a volunteer, who was under no obligation to the assignor. In the case of the prior insurer, on the other hand, there had been an assumption of liability which would mature into [a] right of action against the insurer

whenever loss should occur. In the case of an attempted assignment after loss the consideration therefor moves from the assignee to the assignor. In the case of the prior insurer the consideration—the premium—moves in the opposite direction, from insured to insurer. The two cases are clearly different, both in their inherent character and in their relation to the public good. . . .' " Id., 141, quoting *City of New York Ins. Co.* v. *Tice*, 154 Kan. 176, 180–81, 152 P.2d 836 (1944).

We, however, have continued to adhere to the *Berlinski* rule, and have applied it to prevent an insurer that had paid uninsured motorist benefits from assuming control over an action that had been instituted by the insured against the tortfeasor. *Ciulewicz* v. *Doyle*, 172 Conn. 177, 374 A.2d 175 (1976). We have now decided, however, in light of the overruling of *Hardware Dealers*, to reexamine *Berlinski* in order to determine whether its rule remains sound without our reliance on *Hardware Dealers*.

The heart of the decisions in *Hardware Dealers* and *Berlinski* was the characterization of subrogation as the equivalent of assignment. From that point, it was a logical step to the conclusion that, because the cause of action involved personal injuries, the action was barred by the long-standing rule that personal injury actions may not be assigned. We now conclude that, as Crum and Forster contends, the presupposition that subrogation and assignment are indistinguishable is flawed.[6]

The law has recognized two types of subrogation: conventional; and legal or equitable.[7] 73 Am. Jur. 2d

---

[6] In *Ciulewicz* v. *Doyle*, supra, 172 Conn. 178, the plaintiff admitted that the subrogation agreement constituted the assignment of a personal injury claim. To the extent that *Ciulewicz* may appear to endorse such a conclusion, we also overrule that case.

[7] Although the second type of subrogation that we discuss has been characterized as legal subrogation, we believe that the more accurate characteriza-

599, Subrogation § 2 (1974 and 1995 Sup.) The difference between these two types of subrogation is crucial to our analysis.

"Conventional subrogation can take effect only by agreement and has been said to be synonymous with assignment. It occurs where one having no interest or any relation to the matter pays the debt of another, and by agreement is entitled to the rights and securities of the creditor so paid." Id., § 9; see also *Security Ins. Co. of New Haven* v. *Mangan*, 250 Md. 241, 242 A.2d 482 (1968).

By contrast, "[t]he right of [equitable] subrogation is not a matter of contract; it does not arise from any contractual relationship between the parties, but takes place as a matter of equity, with or without an agreement to that effect." *Hartford Accident & Indemnity Co.* v. *Chung*, 37 Conn. Sup. 587, 592, 429 A.2d 158 (1981). "The object of [equitable] subrogation is the prevention of injustice. It is designed to promote and to accomplish justice, and is the mode which equity adopts to compel the ultimate payment of a debt by one who, in justice, equity, and good conscience, should pay it." (Internal quotation marks omitted.) *Cottiero* v. *Ifkovic*, 35 Conn. App. 682, 686, 647 A.2d 9, cert. denied, 231 Conn. 938, 651 A.2d 262 (1994). As now applied, the doctrine of equitable subrogation "is broad enough to include every instance in which one person, not acting as a mere volunteer or intruder, pays a debt for which another is primarily liable, and which in equity and good conscience should have been discharged by the latter." (Internal quotation marks omitted.) *Sehremelis* v. *Farmers & Merchants Bank*, 6 Cal. App. 4th 767, 777, 7 Cal Rptr. 2d 903 (1992); see also *Compania Anonima Venezolana de Navegacion* v. *A.J. Perez*

tion is equitable subrogation because it derives from the equitable principle against unjust enrichment.

*Export Co.*, 303 F.2d 692 (5th Cir.), cert. denied, 371 U.S. 942, 83 S. Ct. 321, 9 L. Ed. 2d 276 (1962); *American Southern Ins. Co.* v. *Dime Taxi Service, Inc.*, 275 Ala. 51, 151 So. 2d 783 (1963); *Application of Mach*, 71 S.D. 460, 25 N.W.2d 881 (1947). Subrogation is a highly favored doctrine; *Smith* v. *Clavey Ravinia Nurseries, Inc.*, 329 Ill. App. 548, 69 N.E.2d 921 (1946); *Standard Accident Ins. Co.* v. *Pellecchia*, 15 N.J. 162, 104 A.2d 288 (1954); *3105 Grand Corp.* v. *New York*, 288 N.Y. 178, 42 N.E.2d 475 (1942); which courts should be inclined to extend rather than restrict. *First National Bank of Atlanta* v. *American Surety Co.*, 71 Ga. App. 112, 30 S.E.2d 402 (1944); *Menorah Nursing Home, Inc.* v. *Zukov*, 153 App. Div. 2d 13, 548 N.Y.S.2d 702 (1989).

In *Berlinski*, we failed to consider adequately the distinction between conventional and equitable subrogation. In retrospect, it is plain that *Berlinski* did not involve a party who had no interest in the matter of paying the debt of another. As the dissent in *Berlinski* noted, because the insurer was contractually obligated to pay uninsured motorist benefits to its insured, it had a legitimate financial interest in the outcome of the lawsuit. *Berlinski* v. *Ovellette*, supra, 164 Conn. 496. *Berlinski*, therefore, did not involve conventional subrogation.

Instead, *Berlinski* involved equitable subrogation. The insurer was not acting as a mere volunteer; rather, it was obligated by a preexisting contract of insurance to pay the losses of its insured. Upon such payment, the insurer became subrogated to any rights that its insured might have had against the party who had caused the loss. The tortfeasor, who was the party primarily liable for the losses sustained by the insured, benefited by the insurer's payment of a debt truly owed by the tortfeasor. We see no logical reason to permit a tortfeasor to be unjustly enriched by virtue of having its debt paid by the insurance company of a party who

had the foresight to obtain insurance coverage, and thus to escape all liability for its wrongdoing, simply because the insurance company was not permitted to participate in a suit against the tortfeasor in order to recover the money that it had paid to its insured but which was properly payable by the tortfeasor.

Moreover, the public policy reason most often cited as supporting the rule disallowing the assignment of actions to recover for personal injuries, namely, champerty, simply does not exist in the context of equitable subrogation. As an equitable subrogee, the insurance company in *Berlinski*, rather than acting as a volunteer or complete stranger to the action, made payment to its insured as the result of a preexisting contract of insurance. Upon payment, the insurer became subrogated to the rights its insured may have had against the party responsible for the loss. Under such circumstances, we need not be concerned about "unscrupulous interlopers and litigious persons [who are] to be discouraged from purchasing claims for pain and suffering and prosecuting them in court as assignees." Id., 486.

Another concern expressed in *Berlinski* was that permitting an action by the insurer would prejudice the ability of the injured party to be compensated fully. Id. That concern is also illusory, because in the context of uninsured motorist coverage, the injured party has received full compensation from his uninsured motorist insurance coverage.

Furthermore, the *Berlinski* rule may lead to unjust results. First, the rule denies the insurance company the opportunity "to compel the ultimate payment of a debt by one who, in justice, equity, and good conscience, should pay it." (Internal quotation marks omitted.) *Cottiero* v. *Ifkovic*, supra, 35 Conn. App. 686. Once the insured has been paid uninsured motorist coverage benefits, he has no incentive to bring an action against

the party causing the loss. Second, if the damage had involved property damage, rather than personal injuries, the insurer would be permitted to maintain a subrogation action. "Undoubtedly, the distinction is based on the desire not to allow trafficking in pain and suffering, but since the real beneficiary of the [*Berlinski*] decision is the uninsured defendant, the distinction should be viewed from his position. So viewed, he would simply shake his head in disbelief if told that his victim's insurance carrier was going to sue him for the damage to the car and to the ruined Hart Schaffner and Marx suit, but that he wouldn't have to worry about the fact that the victim is now a paraplegic unless the victim himself brought the action." W. Horton, "Subrogation Suits After *Berlinski*," 47 Conn. B.J. 354, 362–63 (1973). Third, as the present case suggests, continued application of the *Berlinski* rule might well encourage liability carriers wrongfully to deny liability coverage, in the knowledge that the injured party will be compensated by uninsured motorist benefits paid by his own insurer, while the liability carrier will be shielded from any scrutiny of its decision to deny coverage.

Finally, we note that this subrogation action arises in the context of automobile insurance, a heavily regulated field. Crum and Forster, having provided liability coverage to Peck, was obligated also to provide uninsured motorist coverage.[8] Thus, if any social evils like those contemplated by the rule against champerty arise, the commissioner of insurance has ample authority to take appropriate regulatory action.

We conclude, therefore, that equitable subrogation is not the equivalent of the assignment of a personal injury action, and that in the absence of that starting

---

[8] General Statutes § 38a-336 (formerly § 38-175c) provides in relevant part: "Uninsured and underinsured motorist coverage. (a) (1) Each automobile liability insurance policy shall provide insurance, herein called uninsured and underinsured motorist coverage . . . for the protection of persons

point, there is no logical support for the decision in *Berlinski*. Accordingly, we overrule our previous decision in *Berlinski* v. *Ovellette*, supra, 164 Conn. 482. We therefore conclude that the trial court improperly granted Allstate's motion to strike.

The judgment is reversed and the case is remanded for further proceedings according to law.

In this opinion the other justices concurred.

insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles and underinsured motor vehicles . . . ."