BRIAN WASKO ET AL. *v.* JAMES MANELLA
(AC 22286)

Mihalakos, Bishop and Peters, Js.

Argued September 12—officially released December 10, 2002

*John C. Turner, Jr.,* for the appellant (defendant).

*Erik E. Roberts,* for the appellee (substitute plaintiff).

*Opinion*

BISHOP, J. This appeal presents a novel question regarding an insurer's subrogation rights when a houseguest accidentally burns down an insured's vacation home. The defendant, James Manella, appeals from the trial court's award of $132,505 to the plaintiff, Middlesex Mutual Assurance Company (Middlesex),[1] which insured and paid the claim on the destroyed house. Manella contends that the court improperly concluded that the insurance company has a right of subrogation against him, that the court should have allowed testimony by the insured as to his understanding of the insurance contract and that the calculation of the damages award was faulty. We reverse the judgment of the trial court.

The facts in this case are not in dispute. In 1993, Brian Wasko and Phyllis Wasko, residents of Weston, owned a house on Shore Road in Goshen that they used primarily on weekends and vacations. Manella was a friend and business associate of the Waskos who had recently moved to New York City. The Waskos offered to let Manella stay at their house in Goshen on the weekend of February 5, 1993, with the proffered hope that he might be interested in renting or buying it in the future. Manella accepted that offer. While at the house in Goshen, he lit a fire in the fireplace, and, when he was ready to return to New York, he emptied the ashes and embers into a paper bag, which he placed

[1] Middlesex is the substitute plaintiff subrogee for the subrogors, Brian Wasko and Phyllis Wasko, the insured homeowners who no longer are parties in interest to this action.

outside on the porch. After he departed, the house caught fire and was substantially destroyed. The fire marshal of the town of Goshen determined that the ashes and embers in the paper bag had caused the blaze.

The house was insured under a homeowners policy from Middlesex. Pursuant to the insurance policy, Middlesex paid the Waskos $48,500 for the lost personal property and $84,005 for the lost dwelling for a total of $132,505. In October, 1993, the Waskos brought an action against Manella sounding in negligence, recklessness and res ipsa loquitur. In March, 1997, Middlesex was substituted as the real party in interest.

On April 14, 2000, Manella filed a motion for summary judgment on all counts, of which only the negligence count survived.[2] At that time, Manella argued that Middlesex had no right of subrogation and that a social houseguest should be considered an "implied co-insured" under the policy. The court was unpersuaded. On October 13, 2000, it held, in a memorandum of decision, that Middlesex could subrogate the Waskos' claim because the homeowners policy did not specify coverage for social guests. In short, Manella was not an insured under the terms of the policy.

In the subsequent trial to the court on July 24 and 25, 2001, the court found that Manella had been negligent and that his negligence had caused the destruction of the Waskos' house and personal property. The court awarded Middlesex $132,505 in damages.

In this appeal, Manella argues that Middlesex does not have a right of subrogation against a social guest.

[2] The court ruled that res ipsa loquitur is not a cause of action in itself, but merely a method of proving negligence. The recklessness count was dismissed because it would have allowed Middlesex to recover punitive damages, i.e., more than it had disbursed to the Waskos, which would contravene statutory limits on subrogation. See General Statutes § 38a-307. The court's decision on the recklessness and res ipsa loquitur counts has not been challenged.

Manella further argues that the court improperly precluded Brian Wasko, the insured, from testifying as to his understanding of the scope of coverage of his homeowners policy and that the calculation of replacement value of the personal property was determined inaccurately. Because we agree with Manella as to the first claim, which is that Middlesex has no right of subrogation against him, we need not reach the remaining issues.

Our analysis begins with a consideration of the nature of subrogation. Subrogation is a concept that has its roots in doctrines of equity, and it is applied by operation of law. 83 C.J.S., Subrogation § 3 (b) (1953).[3] "The determination of what equity requires is a matter for the discretion of the trial court. . . . Our review of a trial court's exercise of the legal discretion vested in it is limited to the questions of whether the trial court correctly applied the law and could reasonably have reached the conclusion that it did." (Internal quotation marks omitted.) *Rosenblit* v. *Williams*, 57 Conn. App. 788, 792, 750 A.2d 1131, cert. denied, 254 Conn. 906, 755 A.2d 882 (2000). When the court draws conclusions of law, our review is plenary. *Torres* v. *Waterbury*, 249 Conn. 110, 118, 733 A.2d 817 (1999).

The right of subrogation, though it originates from principles of equity, can arise out of statute, the common law or contract. R. Keeton & A. Widiss, Insurance Law (1988) § 3.10 (a) (1), p. 220. In its simplest form, subrogation allows a party who has paid a debt to "step into the shoes" of another (usually the debtee) to assume his or her legal rights against a third party to prevent that party's unjust enrichment. Id., 219. In that way, an insurance company, for example, can be substi-

---

[3] See also R. Keeton & A. Widiss, Insurance Law (1988) § 3.10 (a) (1)-(2), pp. 219–23; see Restatement (First), Restitution, Subrogation § 162, comment (a), p. 653 (1937).

tuted for the insured in an action against a third party tortfeasor. The insured, having been paid by the insurer, in essence, transfers his rights against the tortfeasor to the insurer. The insurer, thus, can attempt to collect from the party that caused the loss to the extent expended by the insurer in satisfying the claim.

Typically, two types of subrogation are distinguished, conventional and equitable. *Westchester Fire Ins. Co.* v. *Allstate Ins. Co.*, 236 Conn. 362, 370, 672 A.2d 939 (1996). Conventional subrogation, which is closely associated with the principle of assignment, arises only by agreement between two parties, after a loss, when a party, under no obligation to do so, pays the debt of another. Id., 371. Where, as here, the insurer clearly has an interest in the matter and acquires that interest before the loss occurs, conventional subrogation, it would seem, is not applicable. See id.

In contrast, equitable subrogation arises strictly as a matter of equity, regardless of whether there is an explicit agreement. Id. "It is designed to promote and to accomplish justice, and is the mode which equity adopts to compel the ultimate payment of a debt by one who, in justice, equity, and good conscience, should pay it." (Internal quotation marks omitted.) Id. In the past, equitable subrogation could be applied in "every instance in which one person, not acting as a mere volunteer or intruder, pays [the] debt for which another is primarily liable, and which in equity and good conscience should have been discharged by the latter." (Internal quotation marks omitted.) Id.

The distinction between conventional and equitable subrogation is pertinent to our consideration of the issue this appeal presents. At first blush, conventional subrogation, also known as contractual subrogation, might seem to be the appropriate descriptor of the insurer's right, in this case, because there are explicit

terms in the insurance contract that refer to the insurer's right of subrogation.[4] Specifically, in the "subrogation" clause of the insurance contract, the language recites that the insurer *may* require an assignment of rights of recovery,[5] and, if asked, the insured *must* cooperate. Here, the Middlesex did, in the course of events, require the assignment, and the Waskos dutifully cooperated. If, in fact, the insurer's right of subrogation rested on that clause, we would be reluctant to abrogate the subrogation rights for which the parties contracted.

The contract, however, is not the source of the right, but rather is a reference to those rights that may exist at law or in equity. Despite the contractual language, the basis of the insurer's right of subrogation in this case is equitable. "A right of true [equitable] subrogation may be provided for in a contract, but the exercise of the right will, nevertheless, have its basis in general principles of equity rather than in the contract, which will be treated as being merely a declaration of principles of law already existing." 83 C.J.S., supra, § 3 (b). "The right of [equitable] subrogation is not a matter

---

[4] Middlesex's homeowner's insurance policy states: "An insured may waive in writing before a loss all rights of recovery against any person. If not waived, we may require an assignment of rights of recovery for a loss to the extent that payment is made by us. If an assignment is sought, an insured must sign and deliver all related papers and cooperate with us."

[5] We leave undecided as unnecessary to our consideration whether that clause is an assignment or a subrogation clause. See M. Quinn, "Subrogation, Restitution, and Indemnity: The Law of Subrogation," 74 Tex. L. Rev. 1361, 1388 (1996) (book review). "The unnecessary and ill-considered nature of subrogation agreements has been understood for a number of years." Id., 1390. Professor Quinn suggests that these stock clauses in insurance contracts are best characterized as assignments of subrogation rights, or subrogation agreements, that confer no new rights. Id., 1389. "Although subrogation clauses are very common in insurance policies, on the whole they merely confirm rights that would exist without them, and at most they alter the incidents of legal subrogation in some particulars." Id., 1390. Traditionally, those particulars are limitations on the right, i.e., waivers and modifications, but they cannot be used to enlarge or to defeat liability. 83 C.J.S., supra, § 3 (b).

of contract; it does not arise from [the] contractual relationship between the parties, but takes place as a matter of equity, with or without an agreement to that effect."[6] Id. In sum, the subrogation clause in the insurance policy before us merely requires the insured to yield to the insurer those subrogation rights that equity provides. We conclude, therefore, that the plaintiff's right of subrogation is meted by principles of equity. That understanding better comports with the characterization of equitable subrogation in *Westchester Fire Ins. Co.*

Having determined that the insurer's right of subrogation is equitable in nature, we turn to a consideration of its reasonable parameters. The recently decided case of *DiLullo* v. *Joseph*, 259 Conn. 847, 792 A.2d 819 (2002), illuminates the bounds of the equitable right of subrogation in the insurance context. In *DiLullo*, the issue was whether, in the absence of a specific agreement between the landlord and tenant, a landlord's fire insurer has a right of subrogation against a tenant for negligently causing a fire that damaged the rented property. Id., 848. In particular, the court sought a default rule for when landlords and tenants fail to explicitly allocate their risks in their leases or elsewhere. Id., 851.

Founding its decision on Connecticut's strong public policy against economic waste, our Supreme Court determined that when two (or more) parties have an insurable interest in a premises, it would be economically redundant for them to have identical or overlapping coverage. Id., 854. When principles of equity are invoked, such as with subrogation, a court must examine both the public policy implicated and the basic elements of fairness. Id., 853. In doing so, the court

---

[6] In other words, the right arises when payment is made to the insured. *Westchester Fire Ins. Co.* v. *Allstate Ins. Co.*, supra, 236 Conn. 372. "Upon such payment, the insurer became subrogated to any rights that its insured might have had against the party who had caused the loss." Id.

concluded that it would be inappropriate to create a default rule that would require that every tenant carry sufficient insurance to cover the cost of an entire building that was, presumably, already insured by the landlord. Id., 854. "This duplication of insurance would, in our view, constitute economic waste and, in a multiunit building, the waste would be compounded by the number of tenants." Id.

Following the reasoning in *DiLullo*, we conclude that it would be similarly wasteful to require that every individual carry insurance on every building he or she enters, if only briefly, to avoid the consequences of a subrogation suit. Moreover, the strain on the limits of equity is, we believe, even greater when the situation involves a host and guest. We premise that conclusion on several reasons. Where, in a landlord-tenant relationship, the lease provides a convenient mechanism for cost allocation, in a host-guest relationship there is rarely any explicit agreement that might allow the insertion of terms to allocate risks. Most visits occur "in the absence of an express agreement between the parties covering the question . . . ." Id., 850. Also, to suggest that every houseguest should carry a liability policy adequate to protect him or her from the consequences of negligence in another's home would cause significant economic waste because the insurance necessary for the protection against a home's loss would be multiplied by the number of guests staying at or visiting the residence. Finally, we can reasonably contemplate the significant difficulties insurance carriers would have in determining premium costs in order to make roaming property damage insurance policies available to guests and visitors, whose visiting habits would be elusive to prediction. In contrast, such premium pricing difficulties do not attend insuring property of ascertainable value.

In *DiLullo*, our Supreme Court was persuaded by the reasoning that "in most instances, neither landlords nor tenants ordinarily expect that the landlord's insurer would [proceed] against the tenant, unless expert counseling to that effect had forewarned them." Id., 854. With the informality inherent in a host-guest relationship, the expectation of an insurer's subrogation suit, we believe, would be even more removed.

Although there are many states that have adopted the rule barring subrogation against tenants,[7] Middlesex argues that this case is significantly different because it involves neither a landlord-tenant relationship nor a guest who is a relative. The Waskos' insurance policy names as additional insureds residents of the household who are relatives and their minor charges.[8] In this somewhat uncharted territory of equitable principles, for determining whether a right of subrogation should lie, we find that the actual relationship between the insured and the defendant is more compelling than whether the defendant fits into a category of coinsureds, as contractually defined.

On that point, we find the reasoning in *Reeder* v. *Reeder*, 217 Neb. 120, 348 N.W.2d 832 (1984), to be

[7] Most recently, the Supreme Judicial Court of Maine, citing and largely following the reasoning of *DiLullo*, disallowed a landlord's insurer from proceeding against a residential tenant in a subrogation action. *North River Ins. Co.* v. *Snyder*, 804 A.2d 399, 403–404 (Me. 2002). "To suggest the fire insurance does not extend to the insurable interest of an occupying tenant is to ignore the realities of urban apartment and single-family dwelling renting. . . . Certainly it would not likely occur to a reasonably prudent tenant that the premises were without fire insurance protection or if there was such protection it did not inure to his benefit and he would need to take out another fire policy . . . . Perhaps this comes about because the companies themselves have accepted coverage of a tenant as a natural thing." (Internal quotation marks omitted.) Id., 402–403; see *Seaco Ins. Co.* v. *Barbosa*, 435 Mass. 772, 776–77 n.4–5, 761 N.E.2d 946 (2002), for a survey of states that have decided the question.

[8] Middlesex's homeowner's insurance policy states: " '[I]nsured' means you and the residents of your household who are: a. your relatives; or b. other persons under the age of 21 and in the care of any person named above."

persuasive. In *Reeder*, a guest caused fire damage to the house at which she was staying, and the trial court denied the host's insurer the right of subrogation. While the facts in *Reeder* involved one brother and his family staying as guests at another brother's house, the Nebraska Supreme Court was explicit in its characterization of their relationship as that of host and guest, and the reasoning used to decide that case did not hinge on their familial ties.[9] The court stated that characterizing their relationship as that of landlord-tenant or licensor-licensee also was immaterial and unhelpful. "The arrangement, for whatever difference placing titles on it may be, was really that of a host and guest."[10] Id., 125–26. Having found that the relationship was one of host and guest, the court in *Reeder* found that it would be inequitable to permit the homeowner's insurer to have a right of subrogation against the homeowner's guest. Id., 129.

By adopting the reasoning of *DiLullo*, this court arrives at the same conclusion as did the court in *Reeder*, albeit by a different route. In *Reeder*, the court reasoned that "[the] question is not whether the relationship between the brothers was that of landlord/tenant or licensor/licensee, but whether the carrier, by seeking to recover from [the homeowner's] 'guest,' is,

[9] "This appears to be a case of first impression in this jurisdiction and presents the question of whether one who occupies the home of another with the owner's permission, and who negligently causes damage to the home, may be sued by the owner's insurance carrier under a right of subrogation after the insurance carrier has paid the owner for damages." *Reeder* v. *Reeder*, supra, 217 Neb. 121.

[10] "The word [guest] is descriptive of a relationship known to the common understanding. Besides its somewhat narrow technical significance in statutes, it has a broad, general meaning, implying both a social relationship and the existence of a host; and has been defined in general, as meaning a person entertained in one's house or at one's table, a visitor entertained without pay; a person received and entertained at the house of another, a visitor . . . hence a person to whom the hospitality of a home, club, etc., is extended." 39 C.J.S. 447, Guest (1976).

in effect, seeking to recover from the insured himself for the very risk that the carrier insured and for which it received premiums." Id., 126. In that light, in contrast to the principle of subrogation, the *guest*, as opposed to the insurer, is seen as "stepping into the shoes" of the insured homeowner. This characterization effectively preempts subrogation, as an insurer generally is forbidden from using subrogation against its insured. Id., 128–29.

The court in *DiLullo* declined to adopt the "implied co-insured" theory[11] that was found to be persuasive to the trial court (and to the court in *Reeder*) and affirmed the decision on other grounds. The court concluded that, in such cases, the denial of subrogation was "sound as a matter of subrogation law and policy . . . outweigh[ing] the criticisms and the usual rules of insurance and contract law." *DiLullo* v. *Joseph*, supra, 259 Conn. 853. Similarly, we are convinced by the fairness of the result in *Reeder*.

We find it fair—and fairly within the contemplation of the insured—that one of the benefits of purchasing homeowners insurance is that the insureds need *not* sue their guests who negligently cause damage, even though they would be within their rights to do so.[12] As *DiLullo* shows, an insurer is not entitled, in every case, to step into the shoes of the insured. Subrogation "is a fluid concept depending upon the particular facts and circumstances of a given case for its applicability. To

[11] This is known, in the alternative, as the *Sutton* rule, from *Sutton* v. *Jondahl*, 532 P.2d 478 (Okla. App. 1975). The court in *Sutton* reasoned that a tenant is an implied coinsured of a landlord because they both have an insurable interest in the property, and the landlord charges rent that presumably distributes part of the cost of the insurance premium to the tenant. Id., 482.

[12] "It may be presumed that the insured bought this policy so that he would not have to look to his guest for payment in the event of damage caused by the negligent act of the guest." *Reeder* v. *Reeder*, supra, 120 Neb. 129.

some facts subrogation will adhere—to others it will not." *Sutton* v. *Jondahl*, 532 P.2d 478, 482 (Okla. App. 1975).

Insurance carriers are in the better position to assess the risks associated with insuring property and are more capable of doing so than houseguests or their liability carriers who cannot reasonably be expected to anticipate the costs of damage that the guests may cause to unknown properties. They know, or should know, that a rental property will have tenants and that a person's home will have houseguests.[13] The argument that insurers need to be able to choose whom exactly will be covered by the policies they issue is not persuasive because insurers know the value of the property they insure and may reasonably anticipate the likelihood of a loss occurrence with substantially more certainty than a guest can anticipate the loci of his or her visits to come.[14] That insurers do not know exactly who may pass through a homeowner's door does not make their risks unmanageable, whereas the requirement that houseguests either enter a series of risk allocating negotiations with their hosts or financially brace themselves for the potential replacement cost of every structure they visit could be prohibitive, even if it could be calculated in advance. We conclude that a policy on subroga-

---

[13] In the context of subrogation suits, courts have analogized tenants to permissive drivers in automobile insurance. *Sutton* v. *Jondahl*, supra, 532 P.2d 482. The characterization of guests as "permissive users" is even more fitting as the use is similarly gratuitous.

[14] "[The plaintiff] argues that [denying subrogation] jeopardizes most of the insurance industry by exposing insurers to unknown risks. We do not agree. Insurance companies expect to pay their insureds for negligently caused fire, and they adjust their rates accordingly." (Internal quotation marks omitted.) *Agra-By-Products, Inc.* v. *Agway, Inc.*, 347 N.W.2d 142, 150 (N.D. 1984). "If subrogation were permitted . . . . [i]t would also be a windfall for [the insurer] to have collected these premiums over the years for its assumption of this risk and then when the risk actually occurred, by means of this litigation, to transfer the risk wholly . . . . " (Internal quotation marks omitted.) Id., 148.

tion that would encourage economic waste and lawsuits against the invited guests of insureds, while drawing distinctions that would create classes of houseguests based on heredity, marital status and length of stay, does not comport with sound social policy, consumer expectations or with the principles of fairness that the principles of equity espouse.

Accordingly, we hold that in keeping with *DiLullo*, subrogation should not be allowed against a houseguest whose negligence causes damage to the property of an insured homeowner.

The judgment is reversed and the case is remanded with direction to render judgment in favor of the defendant.

In this opinion MIHALAKOS, J., concurred.

PETERS, J., dissenting. This is a very hard case. As the old adage goes, hard cases make bad law.

The legal issue in this case is the proper allocation of a risk of loss. A building has suffered fire damage as the result of the negligence of an invited guest. Should the risk of loss be assigned to the negligent guest or to the insurance company that provided homeowners insurance coverage against the risk of loss with respect to the property that was severely damaged?

The answer to this question would be obvious if the homeowners insurance policy provided coverage for the insured property for the benefit of all comers. The undisputed fact is that it does not. The policy lists those who are covered insureds, and a guest is not one of them.

Perhaps, despite the unambiguous language of the insurance policy, it might be possible to shoehorn persons in the position of the negligent guest into the list of covered insureds. It is established law that, despite

a subrogation clause in the insurance policy, the principle of equitable subrogation precludes an insurer from recovering for a loss arising out of the negligence of one of its own insureds. The insureds have paid for all property losses, including those arising out of their own negligence. 6A J. Appleman & J. Appleman, Insurance Law and Practice (Cum. Sup. 2002) § 4055. Courts in other jurisdictions have treated unlisted members of an extended family as if they were insureds by calling them coinsureds. See, e.g., *Continental Ins. Co.* v. *Bottomly*, 250 Mont. 66, 70, 817 P.2d 1162 (1991); *Reeder* v. *Reeder*, 217 Neb. 120, 126–27, 348 N.W.2d 832 (1984). In *Sutton* v. *Jondahl*, 532 P.2d 478, 482 (Okla. App. 1975), the court extended the category of coinsureds to include a tenant.[1]

The problem with going down that road is that our Supreme Court, in *DiLullo* v. *Joseph*, 259 Conn. 847, 792 A.2d 819 (2002), has held that a person in the position of a tenant, or inferentially a guest, is not a coinsured person. Id., 853. I am bound by that holding.

If a negligent guest is not a coinsured person, what is the basis for assigning the risk of loss to the insurer? Like other contracting parties, insurers have the right to determine whom they will insure.

In my view, it is anomalous to hold that, as a matter of equitable principles, an insurer may not exercise its contractual right of subrogation against a negligent guest who is not a coinsured. The underlying assumption seems to be that the negligent guest should never be responsible as long as his host has homeowners insurance. Why?

In at least two sets of circumstances, a negligent guest *would* be liable for the loss that he caused. If the

---

[1] *Sutton* expressly noted that the tenant was in privity with the landlord. *Sutton* v. *Jondahl*, supra, 532 P.2d 482. The court's reasoning is not as persuasive with respect to a guest.

homeowner had no insurance coverage, or inadequate insurance coverage, or had decided, perhaps to avoid premium increases, not to access his insurance coverage, a negligent guest would be liable to the homeowner. The same result would ensue if a negligent guest had some applicable insurance of his own that could be tapped either by the homeowner or the homeowner's insurer by way of its subrogation rights. The issue of economic waste would simply not arise in either of these sets of circumstances.

The assignment of the risk of loss to the insurer in this case seems to turn, therefore, on matters beyond the insurer's control. Why is it proper to assume that the homeowners' insurer was responsible for a risk of unknowable proportions to which the homeowners policy does not allude? If such a risk was not assumed, I am puzzled why it is unjust to permit the homeowners' insurer to enforce a subrogation clause against someone who is not a coinsured.

Despite my personal reservations, I recognize that our Supreme Court has held that an assignment of risk to an insurer rather than to a tortfeasor is appropriate in the landlord-tenant context. Id., 853–55. That holding may be explained by the ability of an insurer of a landlord to foresee the possibility of negligence by the relevant legal actors. Landlords will have tenants and some tenants will be negligent. Who carries what insurance can be traded out, and the insurer of the landlord properly may be held to have assumed the risk of loss as a default position. With whom could the homeowners' insurer have traded it out in this case? Certainly not with the guest.

The problem with a straightforward answer in favor of the insurer is that it strikes us as unjust. Economically speaking, we presume that an insurer, having provided coverage for the damaged premises by means of a home-

owners insurance policy, is better able to spread the risk of loss caused by negligent guests than is a single guest by himself.

I think one reason why the result seems unjust is that, in our mind's eye, we are led to look at this case in the way that we are accustomed to look at automobile insurance policies. For such policies, it has become standard practice to extend insurance coverage to a permissive user of a covered automobile. See, e.g., *Middlesex Ins. Co.* v. *Quinn*, 225 Conn. 257, 264 n.8, 622 A.2d 572 (1993). Indeed, the Oklahoma Court of Appeals, in *Sutton* v. *Jondahl*, supra, 532 P.2d 482, relied on this analogy as one of its reasons for providing coverage for a landlord's tenant.

It is fanciful to think that, if the homeowners had thought about it, they could have bargained for an additional clause in their property insurance policy to provide protection for negligent guests. People don't haggle with insurance agents about the standard provisions of insurance policies because insurance agents cannot change them.

It is because, in this sense, insurance contracts are different from ordinary contracts that the insurance business has become a regulated industry. See *Serrano* v. *Aetna Ins. Co.*, 233 Conn. 437, 453, 664 A.2d 279 (1995). As a regulated industry, insurers who sell insurance policies in this state must conform their policies to include certain designated essential terms. These terms differentiate between different types of insurance.

For automobile insurance, § 38a-334-5 (d) of the Regulations of Connecticut State Agencies requires automobile liability insurance to extend protection not only to the named insured but also to other persons using the automobile with the permission of the named insured. See also General Statutes § 38a-335. Although

there are some exceptions, they are irrelevant for present purposes.

As best I can tell, there is no similar requirement with respect to homeowners insurance policies. The essential terms for such insurance are described in General Statutes §§ 38a-307 and 38a-308. See also General Statutes § 38a-689. I have been unable to find any regulation that mandates protection for guests who have permission to use the insured property. In sum, protection for negligent guests is not an essential term in a homeowners policy.

It is tempting for us to fill the gap to provide parallel coverage for both kinds of insurance. Prima facie, the need to protect permissive users is equally compelling for both kinds of insurance. Gap-filling is, after all, an accepted judicial practice in the construction of statutes; *Ahern* v. *Thomas*, 248 Conn. 708, 718, 733 A.2d 756 (1999); *New England Cable Television Assn., Inc.* v. *Dept. of Public Utility Control*, 247 Conn. 95, 114, 717 A.2d 1276 (1998); *Renz* v. *Allstate Ins. Co.*, 61 Conn. App. 336, 345, 763 A.2d 1072, cert. denied, 255 Conn. 945, 769 A.2d 59 (2001); and of negotiated contracts. *Willow Funding Co., L.P.* v. *Grencom Associates*, 63 Conn. App. 832, 844, 779 A.2d 174 (2001); 1 E. Farnsworth, Contracts (2d Ed. 1998) § 3.28, p. 398.

I am not persuaded, however, that this rule of construction applies to a standard contract in a regulated industry.[2] At least in the first instance, an insurer should

---

[2] For this reason, it is my view that the trial court properly excluded evidence about the homeowners' personal understanding of the terms of the insurance policy. The property owners have not made even a prima facie showing that their homeowners insurance policy was ambiguous or unconscionable in any way. They have not argued that the insurance agent misled them in any way about the terms of the policy or, indeed, that they discussed their interpretation of the policy with the agent. Private reservations, without more, do not trump the language of a contract. See *Community Action for Greater Middlesex County, Inc.* v. *American Alliance Ins. Co.*, 254 Conn. 387, 399, 757 A.2d 1074 (2000); *Bonito* v. *Cambridge Mutual Fire Ins. Co.*, 64 Conn. App. 487, 490, 780 A.2d 984, cert. denied, 258 Conn. 926, 783 A.2d 1028 (2001).

be able to enforce the terms of an insurance contract that our insurance commissioner and our legislature have approved. The place for trading out the terms to be included in a homeowners insurance policy is in the commissioner's office.

I recognize that I am not on the side of the angels in this case. Nonetheless, I would not extend the holding of *DiLullo* beyond its facts. Accordingly, I respectfully dissent.