**ELM HAVEN CONSTRUCTION
LIMITED PARTNERSHIP
Plaintiff,**

v.

**NERI CONSTRUCTION, LLC and
United States Fidelity & Guaranty Company Defendants.**

**No. 3:01CV1307 (GLG).**

United States District Court,
D. Connecticut.

Sept. 11, 2003.

Timothy T. Corey, Jennifer A. Osowiecki, Eileen R. Becker, Attorney, Pepe & Hazard, Hartford, CT, for Elm Haven Const. LP.

Edward L. Marcus, The Marcus Law Firm, New Haven, CT, John J. O'Brien, Jr., Moller, Peck & O'Brien, Hartford, CT, Edwin L. Doernberger, Saxe, Doernberger & Vita, PC, Hamden, CT, for Neri Const. LLC.

Dennis C. Cavanaugh, Peter E. Strniste, Jr., Gregory K. Holness, Halloran & Sage, Hartford, CT, for United States Fidelity & Guaranty Co.

Jennifer A. Osowiecki, Pepe & Hazard, Hartford, CT, for American Casualty Company Of Reading, Pa.

## MEMORANDUM DECISION

GOETTEL, District Judge.

The plaintiff, Elm Haven Construction Limited Partnership, (EHC), brings this

action against the defendants, Neri Construction, LLC (Neri) and Unites States Fidelity & Guaranty Company (USF & G). This motion concerns the plaintiff's claims against USF & G only. Specifically, the plaintiff claims that USF & G breached its obligations pursuant to a performance bond and a payment bond that it issued on behalf of Neri, and that USF & G breached an implied covenant of good faith and fair dealing. USF & G has filed a motion for summary judgment claiming that the plaintiff (1) is not entitled to any funds pursuant to the performance bond because it failed to declare a default and give sufficient notice of the alleged default, as required by the bond and underlying subcontract; and, (2) cannot sue on the payment bond because it is not a "claimant" as that term is defined in the bond. We agree with USF & G that no genuine issue of fact exists as to any of the plaintiff's claims against it and, for the reasons set forth more fully below, GRANT USF & G's motion for summary judgment.

**Standard**

"Summary judgment is appropriately granted when the evidentiary record shows that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law." *Balfour Beatty Constr., Inc. v. Colonial Ornamental Iron Works, Inc.*, 986 F.Supp. 82, 84 (D.Conn.1997); *see* Fed.R.Civ.P. 56. The court must view all inferences and ambiguities in a light most favorable to the non-moving party. *See Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991), *cert. denied*, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). "A plaintiff raises a genuine issue of material fact if the jury could reasonably find for the plaintiff." *Balfour*, 986 F.Supp. at 84 (citation and internal quotation marks omitted).

Because we must evaluate the terms of a contract, i.e., the performance and payment bonds, summary judgment is appro-priate only when the terms of the agreement are wholly unambiguous. *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir.1975). Contractual language is unambiguous if it has " 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.' " *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir.1989).

Language does not become ambiguous solely because the parties offer conflicting interpretations during the course of litigation. *See Wards Co. v. Stamford Ridgeway Assocs.*, 761 F.2d 117, 120 (2d Cir. 1985); *see also Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir.1983). Instead, the moving party must prove that the contractual language is not susceptible to at least two fairly reasonable meanings. *Schering*, 712 F.2d at 9; *see also Cable Science Corp. v. Rochdale Village, Inc.*, 920 F.2d 147, 151 (2d Cir.1990). If the moving party cannot establish unambiguous contract language, a material issue exists concerning the parties' intent, which is a question of fact, thereby rendering summary judgment inappropriate. *Thompson v. Gjivoje*, 896 F.2d 716, 721 (2d Cir.1990).

**Facts**

In January of 1999, EHC entered into a contract, as general contractor, for a construction project in New Haven, Connecticut. In May of that same year, EHC entered into a contract with Neri, making Neri a subcontractor on the project. In consideration of roughly $3,642,000, Neri agreed to furnish labor, materials, and equipment for the project. The subcontract required also that Neri post a bond guaranteeing the performance of the subcontract and a payment bond for labor and materials for the benefit of Neri's subcon-

tractors and suppliers on the project. USF & G issued the two separate bonds on Neri's behalf. Shortly thereafter, Neri began its work on the project.

Problems arouse between Neri and EHC roughly two months into the project. EHC, as it claims, found that Neri was failing to comply with site plans and specifications. Additionally, EHC alleges that Neri was not using the proper materials, was failing to coordinate its work and was not complying with certain erosion requirements. Around February, 2001, EHC began sending correspondence to Neri and USF & G regarding its displeasure with Neri's performance of its obligations under the contract.

These letters are the focus of our inquiry regarding the performance bond because USF & G claims that EHC failed to declare properly Neri's default under the relevant contract provisions. EHC contests this argument claiming that "USF & G had actual and reasonable notice that [it] had declared Neri in default under the subcontract, and that [it] was making demands upon the performance bond." (Ford Aff. ¶ 25.) We will set forth the relevant contract provisions and letters regarding the performance bond and address the parties' arguments in that regard, followed by our discussion of the payment bond

## Discussion

### Performance Bond and Letters

In relevant part, the performance bond requires specifically that,

Whenever Principal shall be, *and be declared by Obligee to be in default under the subcontract,* the Obligee having performed Obligee's obligations thereunder: (1) Surety may promptly remedy the default subject to the provisions of paragraph 3 herein, or; (2) Obligee after reasonable notice to Surety may, or Surety upon demand of Obligee, may arrange for the performance of Principal's obligation under the subcontract subject to the provisions of paragraph 3 herein; (3) The balance of the subcontract price, as defined below, shall be credited against the reasonable cost of completing performance of the subcontract.

(*See* Schoenhaar Aff., Ex. A (emphasis added.))

The performance bond also incorporated the subcontract between EHC and Neri. Section 9 of the subcontract, entitled "Default and Remedies," provides the circumstances under which the subcontractor is in default. It proceeds further that once Neri is in default, it has seventy-two hours from the time it received written notice from EHC to cure the default. If the time period elapses without cure, EHC may avail itself to various options.[1]

---

1. Section 9. Default and Remedies
 9.1. The Subcontractor shall be in default hereunder if:
 9.1.2. The Subcontractor shall fail to perform in strict accordance with this Subcontract or the Contract Documents, shall be in breach of any term or condition of this Subcontract Agreement, or shall fail to diligently prosecute and perform all or any part of the Subcontract Work or shall fail of refuse to supply sufficient and proper quality workmen, equipment and materials, to the satisfaction of the Contractor.
 9.2. In the event the Subcontractor shall be in default pursuant to Section 9.1 hereof, the Contractor shall give seventy-two (72) hours written notice to the Subcontractor and on the expiration of such period and the failure of the Subcontractor to cure the default, the Contractor may elect any or all of the following remedies without prejudice to any other rights or remedies it may have:
 9.2.1. Provide any labor, materials or equipment necessary to perform the Work subject to this Agreement and to deduct the costs thereof ... from any payments then or thereafter due to the Subcontractor;
 9.2.2. Withhold payment of any monies due the Subcontractor pending corrective action to the extent required by and to the satisfaction of the Contractor;

The plaintiff claims that it "unequivocally made a demand to USF & G under the performance bond" in a letter dated January 18, 2001. (Pl's. Mem. at 3; Schoenhaar Aff., Ex. C.) EHC asserts further that it "put USF & G on notice of Neri's default and asked for assistance under the performance bond" via its February 9, 2001, letter; gave notice of Neri's "refusal to perform" on April 12, 2001; and, gave further notice of default via its April 30, 2001 and May 14, 2001 letters. On June 26, 2001, EHC sent to USF & G another letter, which USF & G considers EHC's first declaration of Neri's default.

The January 18, 2001 letter states in relevant part:

We have enclosed EHC ... analysis of Neri['s] ... contract status.

It should be noted that Neri['s] letter dated 1/15/01, is in response to our verbal request to issue credit values for the road work remaining, with the intention of allowing NERI ... to finalize their remaining work scope on this project expeditiously.

EHC is very concerned that NERI ... does not have adequate funds remaining to complete the work pursuant to your performance bond obligations. EHC is requesting your immediate investigation into this matter.

(Schoenhaar Aff., Ex. C.)

The February 9, 2001 letter states in relevant part:

EHC is again requesting your firm's assistance in the above matters. It has now been over three weeks since EHC has requested NERI['s] ... revised schedule of Values for the above referenced project, and additional information regarding extra work claims which

NERI feels we have unjustly denied. Given NERI['s] position, which has been, that NERI has previously sent EHC all substantiating documentation, how then can this be such a laborious task.

The fact is that NERI ... is once again delaying the submission of information requested by EHC. In accordance with EHC–NERI Contract Article 4.2, NERI has a contractual obligation to submit a revised schedule of values within 10 days of our request.

EHC emphatically requests your firm's response to this matter. This project cannot continue to be impacted by NERI['s] ... refusal to abide by the terms and conditions of the contract. As indicted in Article 2.1 of our contract, time is of the essence.

(*Id.*, Ex. E.)

The April 12, 2001 letter states in relevant part:

EHC acknowledges your firm's refusal to perform work included on [certain site maps] and included in the EHC–NERI Contract. EHC maintains our earlier position that this work is included in the existing EHC–NERI Contract, and will therefore proceed to perform the work by others in accordance with Article 9.2.1 of our Agreement. All costs to complete this work will be the responsibility of NERI.

(*Id.*, Ex. I.)

The April 30, 2001 letter states in relevant part:

Pursuant to our letters referenced above, and as to NERI's failure to per-

---

9.2.3. Terminate the employment of the Subcontractor for the Subcontract Work, enter upon the premises of the Project and take possession of, for the purpose of completing the Subcontract Work, all materials

thereon, employ any other person or persons to finish the Subcontract Work, provide materials in connection therewith.

(Neri Aff., Ex. A at 12–13; Def's. Mem. at 3–4).

form the contract work required on Ashmun Street North, and Admiral Street . . . EHC hereby provides notice to NERI . . . that this work will be performed by others in accordance with EHC–NERI contract, Article 2.1. This action is a result of the following inaction by NERI[:] Failure to provide EHC with updated Permits for the work[,] Failure to start work in accordance with EHC schedule . . . or NERI modified schedule[,] Failure to provide adequate coordination of activities for the work.

EHC has issued ample notice previously regarding your firm's failure to adhere to schedules. NERI has made commitments in our meeting of 4/23/01 to forward Permits by 4/24/01, and begin signage by 4/25/01. It is now 4/30/01, and neither commitment has been met by NERI,

EHC reserves all options available to it under the EHC–NERI contract. Any and all costs, damages, and delays to complete this work will be the sole responsibility of NERI.

(*Id.*, Ex. J.)

The May 14, 2001 letter states in relevant part:

Due to NERI['s] . . . failure to respond to our request for confirmation of your firm's proposed start date for the Webster Street work, in an effort to coordinate the work of this contract with the city CSO work, EHC will proceed with others to coordinate and perform this work. With this action, EHC has now been forced to take over the following items of work from NERI: [1] Ashmun Street South . . . (via EHC letter 4/12/01), [2] Ashmun Street North . . . (via EHC letter 4/30/01), [3] Admiral Street . . . (via EHC letter 4/30/01), [4] Webster Street . . . Dixwell Avenue (via letter 5/14/01).

EHC will now proceed to complete this work by others. All costs, and damages incurred by EHC and the Owner as a result of this action, will be the responsibility of Neri . . . and its surety. Neri must not interfere with this effort to complete the remaining roadbook. EHC has given ample notice to NERI to perform this contract work, and NERI has failed to respond.

(*Id.*, Ex. L.)

The June 26, 2001 letter states in relevant part:

EHC is not in receipt of any responses from your firm's principal, NERI . . . regarding EHC letter dated 5/14/01. EHC had requested a response by 5/23/01. It has been over a month.

As your firm is aware, EHC was forced to supplement NERI forces in completing the balance of the contract work remaining on the . . . project. In fact, Neri . . . has virtually abandoned the project as of 4/30/01. Consequently, EHC has incurred an estimated loss of $942,102.00. Current retainage held to date will be used to offset the NERI shortfall indicated above as follows:

Total NERI shortfall (942,102.00)

Retainage held to date 286,157.00

Total NERI shortfall = ($655,945.00)

EHC has received very little response from USF & G on this project. By virtue of the correspondence issued to USF & G it is extremely apparent that your firm's principal has failed to fulfill its contractual responsibilities under the terms and conditions of the EHC–NERI Contract covered by USF & G bond.

EHC is making great efforts to mitigate the costs to USF & G and its principal NERI. Notwithstanding these efforts there is a significant deficit in the amounts remaining in the EHC–NERI Contract vs. the actual cost to complete the work. EHC holds USF & G respon-

sible for any and all costs incurred by EHC and the Owner, to complete the balance of NERI ... work, as a result of NERI's failure to perform.

(*Id.,* Ex. E.)

USF & G responded to EHC's June 26, 2001 letter by correspondence dated July 13, 2001. In it, USF & G stated that Neri disputed the claim that it abandoned the project and that, according to Neri, EHC had "affirmatively breached its subcontractual obligations to Neri." (*Id.,* Ex. O.) USF & G stated further that to trigger its obligations under the performance bond, Neri had to be in default and EHC had to declare affirmatively that default. Moreover, USF & G asserted that its review of the correspondences, set forth above, reveals no such declaration of default and that EHC's unilateral actions of contracting with Sweeney Excavation have precluded it from exercising its options under the bond.

 Before addressing the merits of the parties' arguments, we note that their relationship is that of a suretyship. "A suretyship is a three-party relationship where the surety, USF & G, undertakes to perform to an obligee, EHC, if the principal, Neri, fails to do so." *See U.S. Fidelity & Guar. Co. v. Feibus,* 15 F.Supp.2d 579, 580 (M.D.Pa.1998), *aff'd,* 185 F.3d 864 (3d Cir.1999). Stated differently, "[T]he general purpose of a suretyship contract is to guard against loss in the event of the principal debtor's default.... [T]he obligation of a surety is an additional assurance to the one entitled to the performance of an act that the act will be performed.... [T]he liability of sureties is to be determined by the specified conditions of the bond." *Ames v. Commissioner of Motor Vehicles,* 70 Conn.App. 790, 797, 802 A.2d 126 (2002).

The first issue before us now is whether any of the several correspondences between EHC and Neri/USF & G constitut-ed a sufficient declaration of Neri's alleged default under the performance bond and whether EHC gave proper notice of the default to USF & G.

In *L & A Contracting v. S. Concrete Services, Inc.,* 17 F.3d 106 (5th Cir.1994), the Fifth Circuit undertook an examination of a virtually identical performance bond to the one at issue here and gave three compelling reasons why it held the term "declare in default" to be unambiguous, thereby rendering anything but a precise declaration of default insufficient under the terms of the contract. *See id.* at 110–11. We find the Court's analysis and reasoning convincing.

The circuit court began with an inquiry into the language of the performance bond to determine if the term "declared ... to be in default" was ambiguous. *See id.* at 110. Though left undefined in the bond, the circuit court found the term to be clear and unambiguous. It made this determination by looking first at the word "declare." According to *Webster's Ninth New Collegiate Dictionary,* it means "to make clear; to make known formally or explicitly; to make evident; to state emphatically." In considering the word "default," the court reasoned, and we agree, that its meaning is distinct insofar as it relates to construction suretyship law. *Id.* The court observed that "[n]ot every breach of a construction contract constitutes a default sufficient to require a surety to step in and remedy it." *Id.* A legal default requires a material breach or series of material breaches such that the obligee is justified in terminating the contract. *Id; see also John T. Brady and Co. v. City of Stamford,* 220 Conn. 432, 446–47, 599 A.2d 370 (1991) (evaluating a surety's claim for a remedy in restitution as requiring a material breach of the contract terms). A material breach on the part of the principal, is not enough, however, it only justifies the

obligee's actions in the next step of the process which is a declaration of default. *See L & A,* 17 F.3d at 110–11. This is the sequence of events that must take place pursuant to the performance bond because it provides that the surety's obligations are triggered only after the principal is in default of its obligations and the obligee declares such default. *See id.* at 109. Thus, there is a distinction in the concepts of "breach" and "default" that is to be recognized in construction suretyship law. *Id.* at 110.

This conceptual distinction is readily visible when viewed against the background of the circuit court's second reason for finding the declaration of default term to be unambiguous and holding that such a declaration must be precise and unequivocal. The court stated,

> serious legal consequences attend a declaration of default, particularly in cases such as this involving multi-million-dollar construction projects. Before a declaration of default, sureties face possible tort liability for meddling in the affairs of their principals. After a declaration of default, the relationship changes dramatically, and the surety owes immediately duties to the obligee. Given the consequences that follow a declaration of default, it is vital that the declaration be made in terms sufficiently clear, direct, and unequivocal to inform the surety that the principal has defaulted on its obligations and the surety must immediately commence performing under the terms of its bond.

*Id.* at 111; *Balfour,* 986 F.Supp. at 85.

Indeed, the district court in *Balfour,* (Covello, J.), relied on this same reasoning in interpreting a declaration of default provision identical to the one in *L & A,* and virtually identical to the one in this case. The court found that the letters sent by the obligee to the principal, which mentioned only the principal's delay and failure in performing its contractual obligations, did not provide the surety with actual notice of default. *See Balfour,* 986 F.Supp. at 84 n. 4, n. 5.

Finally, the Fifth Circuit posited a third reason for finding the term unambiguous and requiring precise declarations of default. *L & A,* 17 F.3d at 111. It stated that the obligee's interpretation "does not promote the purpose for which the parties probably included a notice of default provision" in the performance bond. *Id.* "That purpose was to avoid the common-law rule that a secondary obligor . . . is not entitled to notice when the time for its performance is due," which is not served if the obligee can fulfil its duty to provide notice of default by sending letters that do not state so explicitly. *See L & A,* 17 F.3d at 111 (citing THE RESTATEMENT (FIRST) OF SECURITY § 136 (1941)).

■ Based on the Fifth Circuit's reasoning highlighted above, we, too, find the declaration of default term to be definite and precise such that it is unambiguous. Consequently, absent a "sufficiently clear, direct, and unequivocal" or precise declaration of default, no such declaration will be found to have occurred. We consider now if any of EHC's letters to Neri and USF & G constituted sufficient notice of default.

With the exception of the June 26, 2001 letter, which is discussed below, the most that can be said for the plaintiff's claimed declarations of default is that they constituted complaints regarding Neri's performance, and lack thereof, as well as concerns about Neri's financial status. Though some of these letters identified portions of the project in which EHC was going to supplement or supplant Neri's performance, at no time did EHC declare affirmatively and in a precise manner that Neri was in default on the contract as a whole.

Indeed, the fact that EHC had failed to declare Neri in default is evidenced by the testimony of Mr. John Ford, EHC project manager. He testified that EHC defaulted Neri on *portions* of the remaining work. (Def's. Mem., Ex 1 at 44–47.) He stated further, "[w]e had to default them on *portions of the work,* and we did that. Even when we defaulted them on *portions of the work,* we didn't, you know, *we still wanted them to finish the remaining work.*" (Hearing Trans. 9/6/02 at 20–21; *see* Def's. Mem., Ex. 3.) (emphasis added). As the Court stated in *L & A,* however, a surety is not an insurer of partial breaches because such a proposition cannot be squared with the Bond's requirement of default. *See L & A,* 17 F.3d at 110 n. 13. Significantly, the statements regarding partial breaches exemplifies the conceptual differences between a "breach" and "default" as they pertain to construction suretyship law.

The only evidence of a declaration of default is USF & G's concession that the June 26, 2001 letter operated as such. (Def's. Mem. at 6.) By the time that letter had been sent to USF & G, however, EHC had already contracted with Sweeney Excavation, which precluded USF & G from exercising its options under the performance bond. *See St. Paul Fire & Marine Ins. Co. v. City of Green River, Wyo.,* 93 F.Supp.2d 1170, 1178–79 (D.Wyo.2000) (when surety is stripped of its contractual right to minimize its liability under the performance bond by ensuring that the lowest responsible bidder was selected to complete the job, the performance bond was rendered null and void). While we recognize that USF & G might have acted more diligently in investigating the issues that EHC brought to its attention, EHC could have protected its interests by stating simply in sufficiently clear, direct, and unequivocal language that Neri was in default under the contract and that it demanded USF & G to perform its princi-

pal's obligations or it would proceed as provided for in the contract. This did not occur.

EHC's interpretation of the declaration of default provision is unreasonable. It would render complaints and contractual threats regarding a principal's financial status, its delay in performance, partial breaches, as well as an obligee's decision to have others perform portions of the project work while expecting the principal to continue its obligations under the subcontract, sufficient to declare a default thereby triggering a surety's obligations. Given our discussion above, this would be an undesirable result in the context of construction suretyship law. As the circuit court alluded, many breaches might occur throughout the life of a construction contract——many of which do not constitute a default under a performance bond. And, if a default does occur and the obligee wishes to invoke the surety's obligations, it must precisely inform the surety in a sufficiently clear, direct, and unequivocal manner that such a course has been taken.

### Payment Bond

■ The plaintiff claims that it is entitled to funds pursuant to the payment bond that USF & G issued on behalf of Neri. USF & G claims that EHC cannot sue on that bond because it is not a "claimant" as that word is defined in the payment bond. We agree.

The payment bond states explicitly:
(1) A *claimant is defined as one having a direct contract with the Principal for labor, material, or both,* used or reasonably required for use in the performance of the contract, labor and material . . . .
(2) The . . . Principal and Surety hereby jointly and severally agree with Oligee that every claimant as herein defined, who has not been paid in full before the expiration of ninety (90) days after the date on which the last of such claimant's

work or labor was done or performed, or materials were furnished by such claimant, may sue on this bond. . . . The Obligee shall not be liable for the payment of any costs or expenses of any such suit.

(Schoenhaar Aff., Ex. B.)

The subcontract provides:

Section 4.4. The Contractor shall have the right at all times to contact the Subcontractor's subcontractors and suppliers to ensure that the same are being paid by the Subcontractor for labor or materials furnished for use in performing the Subcontractor's work. *No payments will be made to the Subcontractors sub-subcontractors or suppliers without the prior approval of this Subcontractor* [Neri] *and its bonding company* [USF & G].

Section 4.8. In the event the Contractor has reason to believe that labor, material or other obligations incurred in the performance of the Subcontractor's Work are not being paid, the Contractor may take steps deemed necessary to insure that any progress payment shall be used to pay such obligations, including the issuance of joint checks. This right shall not be deemed to give rise to any rights in or create a third party beneficiary relationship. *No payments will be made to [the] Subcontractors sub-subcontractors or suppliers without [the] prior approval of [this] Subcontractor* [Neri] *and its bonding company* [USF & G].

(*See* Neri Aff., Ex. A at 6, 7.) (emphasis added).

The payment bond is plain and clear in defining "claimants" as those materialmen who have a direct contract with the principal, Neri. EHC, the obligee, does not fall within the purview of this definition. Moreover, the subcontract states expressly that EHC shall not make any payments to any of Neri's subcontractors without con-

sent from Neri and USF & G. The record does not support, and EHC does not assert, that it ever sought such approval.

■ EHC does assert, however, that because "USF & G did not accept EHC's claims against the bonds, or the claims of at least one of Neri's subcontractors, [it] had to make payments to one of Neri's subcontractors on the project." (Ford Aff. ¶ 20.) "In Connecticut it is well established in the common law that an assignee stands in the shoes of the assignor." *National Loan Investors Ltd. Partnership v. Heritage Square Associates,* 54 Conn.App. 67, 73, 733 A.2d 876 (1999). The record, however, is devoid of any evidence that EHC became an assignee of any of Neri's subcontractors' rights under the payment bond.

We conclude that the payment bond and subcontract terms are unambiguous; EHC's assertion that it is a claimant under the payment bond is patently unreasonable. Moreover, EHC did not seek authorization from Neri and USF & G prior to making the alleged payment to an unspecified subcontractor, and it has failed to show that it stands in the shoes of a claimant with the right to sue on the payment bond.

**Conclusion**

Having determined the contracts at issue here to be unambiguous, we find that no genuine issue of material fact exists as to the plaintiff's claims under the performance and payment bonds. Further, the plaintiff's claim that the USF & G breached an implied covenant of good faith and fair dealing, which is inextricably tied to its claim on the performance bond, presents no genuine issues of material fact. Consequently, we **GRANT** USF & G's motion for summary judgment [**Doc. 70**] as to

those claims. The clerk is directed to enter judgment in favor of USF & G.

**SO ORDERED.**