376 F.3d 96
 ELM HAVEN CONSTRUCTION LIMITED PARTNERSHIP, Plaintiff-Counter-Defendant-Appellant,
v.
NERI CONSTRUCTION LLC., et al., Defendant-Counterclaim-Plaintiff-Third-Party-Plaintiff, and
United States Fidelity And Guaranty Company, Defendant-Appellee.
 No. 03-7967.
 United States Court of Appeals, Second Circuit.
 Argued: June 10, 2004.
 Decided: July 23, 2004.
 
 Appeal from the United States District Court for the District of Connecticut, Gerard L. Goettel, J.
 Jennifer A. Osowiecki, Pepe & Hazard LLP, Hartford, Connecticut, for Plaintiff-Counter-Defendant-Appellant.
 James V. Somers, (Dennis C. Cavanaugh, Robert M. Barrack, Peter E. Striniste, Jr., on the brief) Halloran & Sage LLP, Hartford, Connecticut, for Defendant-Appellee.
 Before: WALKER, Chief Judge, WINTER, and JACOBS, Circuit Judges.
 WINTER, Circuit Judge.
 
 
 1
 Elm Haven Construction L.P. ("Elm Haven") appeals from Judge Goettel's grant of summary judgment to United States Fidelity and Guaranty Company ("USF & G") on Elm Haven's claims against Performance and Payment Bonds issued by USF & G. The district court held that USF & G was not liable on the Performance Bond because Elm Haven failed, as required by the bond, to declare a default and to allow USF & G to cure that default before Elm Haven hired a replacement subcontractor. The court further held that USF & G was not liable to Elm Haven on the Payment Bond because Elm Haven was not a "claimant" entitled to sue on the bond and had not been assigned the rights of any claimant. We affirm.
 
 BACKGROUND
 
 2
 On January 26, 1999, Elm Haven and Neri Construction LLC ("Neri") entered into a subcontract agreement with Neri as subcontractor and Elm Haven as general contractor. Pursuant to the subcontract agreement, Neri purchased a Performance Bond and a Payment Bond from USF & G on March 16, 1999. Connecticut law governs the subcontract agreement and the bonds.
 
 
 3
 The Performance Bond, which was in the amount of $3,642,600, imposed certain obligations and conferred certain rights on USF & G ("Surety") if Elm Haven ("Obligee") declared Neri ("Principal") to be "in default," as follows:
 
 
 4
 Whenever Principal shall be, and be declared by Obligee to be in default under the subcontract, the Obligee having performed Obligee's obligations thereunder:
 
 
 5
 (1) Surety may promptly remedy the default subject to the provisions of paragraph 3 herein, or;
 
 
 6
 (2) Obligee after reasonable notice to Surety may, or Surety upon demand of Obligee, may arrange for the performance of Principal's obligation under the subcontract subject to the provisions of paragraph 3 herein;
 
 
 7
 (3) The balance of the subcontract price, as defined below, shall be credited against the reasonable cost of completing performance of the subcontract.
 
 
 8
 The subcontract agreement between Neri and Elm Haven was made a part of the Performance Bond by reference. The subcontract agreement outlined procedures to be followed in the event of a default by Neri. Elm Haven was required to give Neri 72 hours written notice to cure a default, and if Neri did not cure, Elm Haven could perform the work itself, withhold payment from Neri, and/or terminate its subcontract agreement with Neri and hire another subcontractor. Thus, a partial default under the subcontract agreement did not require a termination of that agreement.
 
 
 9
 The Payment Bond was for $3,642,600 "for the use and benefit of claimants." The bond defined a "claimant" as "one having a direct contract with the Principal for labor, material, or both, used or reasonably required for use in the performance of the contract." Under the bond, only claimants who were not paid within 90 days of performance could sue USF & G for the amount due. The subcontract agreement was incorporated into the Payment Bond by reference. That agreement gave Elm Haven several rights with respect to Neri's subcontractors — the potential claimants under the Payment Bond — including the right to ask sub-subcontractors if they were being paid, to refuse progress payments to Neri if such payments were necessary to satisfy liens filed by third parties, and to issue joint progress payment checks to Neri and its subcontractors if Elm Haven believed that the sub-subcontractors were not being paid. The subcontract agreement also included the following sentence, handwritten and initialed by both Neri and USF & G, in three places: "No payments will be made to subcontractors sub-subcontractors or suppliers without prior approval of this subcontractor [Neri] and its bonding company [USF & G]."
 
 
 10
 About two months after work began on the project, Neri and Elm Haven began complaining about each other's performance. Elm Haven sent several letters to Neri, copied to USF & G, detailing its complaints about Neri's performance and failure to respond to inquiries from Elm Haven. It also sent letters to USF & G requesting its "assistance in this matter." Beginning in April, several letters informed USF & G and Neri that certain portions of the work for which Neri was responsible would be performed by others because Neri had either failed to perform, or claimed that it was not contractually required to perform, that work. For example, the April 30 letter stated that, because Neri had failed to perform certain parts of its work, Elm Haven "hereby provides notice to [Neri] that this work will be performed by others in accordance with" the default provisions of the subcontract agreement. On May 17, 2001, Elm Haven contracted with another subcontractor — Sweeney Excavation — to replace Neri. Moreover, two of Neri's sub-subcontractors or suppliers made payment claims against Elm Haven, and one of them filed a mechanic's lien against Elm Haven. Elm Haven paid the lienholder claimant directly, without seeking approval from Neri or USF & G.
 
 
 11
 Finally, on June 26, 2001, Elm Haven wrote directly to USF & G, noting that it had been "forced to supplement NERI forces in completing the balance of contract work," that Neri had "virtually abandoned" the project as of April 30, and that Elm Haven had incurred an estimated loss of $942,102. USF & G responded by stating that it was not liable to Elm Haven under the Performance Bond.
 
 
 12
 The Performance Bond issued by USF & G in connection with this matter clearly sets forth the requirements for notice of default necessary to trigger any obligation on the part of the surety. The language of the Performance Bond clearly requires that, in order to trigger the surety's obligations, the principal shall be in default and that the obligee shall affirmatively declare the principal in default. Review of the file reveals that there has been no declaration of default which would trigger the surety's obligations. Elm Haven's unilateral actions have precluded USF & G from performing an investigation and exercising its options under the bond.
 
 
 13
 Elm Haven replied that it had declared Neri in default at least by April 30, 2001, and that USF & G therefore was liable on the Performance Bond.
 
 
 14
 Elm Haven also sought payment from USF & G under the Payment Bond, which was denied. Elm Haven then brought the instant suit against USF & G and Neri on July 11, 2001, alleging in pertinent part that USF & G breached its obligations under both bonds and under the implied covenant of good faith and fair dealing.
 
 DISCUSSION
 
 15
 The district court granted USF & G's motion for summary judgment on August 22, 2003. Relying primarily on L & A Contracting v. Southern Concrete Services, Inc., 17 F.3d 106 (5th Cir.1994), the court held that the "declaration of default term" of the Performance Bond was unambiguous and was satisfied only by a "sufficiently clear, direct, and unequivocal or precise declaration of default." Elm Haven Constr. L.P. v. Neri Constr., LLC, 281 F.Supp.2d 406, 413 (D.Conn.2003). In the court's view, no such declaration occurred prior to Elm Haven's June 26, 2001 letter, by which time Elm Haven had hired Sweeney Excavation, thus "preclud[ing] USF & G from exercising its options" under the bond and rendering the bond void. Id. at 414.
 
 
 16
 The court also granted summary judgment against Elm Haven's claim on the Payment Bond. Id. at 415-16. The court held that Elm Haven was not a "claimant" within the meaning of the Payment Bond and therefore not entitled to recover under it. Id. at 414-15. Furthermore, Elm Haven had never sought approval from Neri or USF & G before paying any claimants, as required by the subcontract agreement, and no claimant had assigned its rights under the Payment Bond to Elm Haven. Id. Finally, the court granted summary judgment against Elm Haven on its implied covenant of good faith and fair dealing claim because that claim was "inextricably tied" to its claim on the Performance Bond. Id. at 415. The grant of summary judgment resolved only the disputes between Elm Haven and USF & G, leaving Elm Haven's case against Neri intact, and the district court certified the partial judgment for appeal under Rule 54(b).
 
 
 17
 We review the district court's grant of summary judgment de novo. Brody v. Village of Port Chester, 345 F.3d 103, 108 (2d Cir.2003). A bond is a contract, and "we look to standard principles of contract interpretation to determine the rights and obligations of a surety under a bond." United States Fid. & Guar. Co. v. Braspetro Oil Servs. Co., 369 F.3d 34, 51 (2d Cir.2004). "One of those principles is that, before a surety's obligations under a bond can mature, the obligee must comply with any conditions precedent." Id.
 
 
 18
 In order to trigger USF & G's liability under the Performance Bond, two conditions had to be met. First, Neri had to be "in default" under the subcontract agreement, and second, Elm Haven had to "declare[ ] [Neri] to be in default under the" subcontract agreement. Such a declaration of default had to be made to USF & G in precise terms. See id. at 57 (a "condition precedent to the Sureties' obligations under the Bonds was a clear notice of default terminating the [principal's] rights under the Contracts."); L & A Contracting Co., 17 F.3d at 111 ("A declaration of default sufficient to invoke the surety's obligations under the bond must be made in clear, direct, and unequivocal language. The declaration must inform the surety that the principal has committed a material breach or series of material breaches of the subcontract, that the obligee regards the subcontract as terminated, and that the surety must immediately commence performing under the terms of its bond."). In Braspetro, this court quoted L & A Contracting for the proposition that "`evidence [is] insufficient as a matter of law to establish a declaration of default' where `[n]one of the letters [obligee-general contractor] sent to [principal-subcontractor] and [surety] even contained the word "default" and where `other items of correspondence' did not contain an `unequivocal declaration of default.'" Braspetro, 369 F.3d at 57 (quoting L & A Contracting, 17 F.3d at 111).
 
 
 19
 The notice of default requirement of the Performance Bond was not met in this case prior to the June 26, 2001 letter. None of Elm Haven's previous letters "even contained the word `default'" or an "unequivocal declaration of default." Id. At best, the earlier letters notified Neri and USF & G that Elm Haven was exercising its rights under the default provisions of the subcontract agreement. However, the letters clearly evidenced Elm Haven's desire to continue its arrangements with Neri and to keep the subcontract agreement in force. If Elm Haven wanted to trigger the Performance Bond at that point, it would have had to terminate its relationship with Neri and give USF & G an opportunity to complete the project itself or hire others to do so. None of Elm Haven's pre-June 26 letters demonstrates an intent to end its relationship with Neri and allow USF & G to take over the project; to the contrary, these letters provided notice that part of Neri's work would be performed by others, indicating only that Neri would continue to perform some work under the agreement and requesting USF & G's help in improving the ongoing relationship with Neri.
 
 
 20
 USF & G concedes that the June 26 letter functioned as a declaration of default. By that date, however, Elm Haven had breached its obligation to USF & G under the Performance Bond to give USF & G the option to cure Neri's default. As noted, Elm Haven hired a replacement subcontractor five weeks before declaring default in the June 26 letter, and incurred further payment obligations in hiring replacement subcontractors before actually defaulting Neri. Thus, Elm Haven failed to meet the requirements of the Performance Bond, excusing USF & G from its performance.
 
 
 21
 Summary judgment was also properly granted against Elm Haven on its Payment Bond claim. It is undisputed that Elm Haven is not a "claimant" within the meaning of the bond and was not assigned the rights of any claimant. In fact, on this appeal Elm Haven asserts its right to payment only on the theory of equitable subrogation. However, Elm Haven forfeited any argument based on this theory by failing to raise it at any time in the district court. See Leyda v. AlliedSignal, Inc., 322 F.3d 199, 207 (2d Cir.2003).
 
 
 22
 Even if Elm Haven's equitable subrogation claim were preserved, it is meritless. Under Connecticut law, "the doctrine of equitable subrogation is broad enough to include every instance in which one person, not acting as a mere volunteer or intruder, pays a debt for which another is primarily liable, and which in equity and good conscience should have been discharged by the latter." Westchester Fire Ins. Co. v. Allstate Ins. Co., 236 Conn. 362, 371, 672 A.2d 939 (1996) (internal quotation marks and citation omitted). Equitable subrogation benefits only those who have some obligation, however indirect, to pay the debt at issue. For example, it applies to an insurer who pays its insured's medical bills before a suit against the party who caused the injury has been completed, id. at 372-73, 672 A.2d 939, or to a surety who pays its obligee and then sues its principal to vindicate the rights of that obligee, Pa. Nat'l Mut. Cas. Ins. Co. v. City of Pine Bluff, 354 F.3d 945, 951 (8th Cir.2004).
 
 
 23
 In paying a claimant, Elm Haven must be deemed an "intruder" because the subcontract agreement explicitly prohibited Elm Haven from paying any of Neri's sub-subcontractors or suppliers without express permission from Neri and USF & G. Furthermore, the agreement set forth alternatives for Elm Haven if it believed that a claimant was not being paid on time — for example, the issuance of joint checks. Elm Haven argues that it is entitled to equitable subrogation due to the language of the Payment Bond, which "firmly bound" USF & G to Elm Haven for the benefit of the "claimants." Elm Haven has it backwards; if Elm Haven were "firmly bound" to do something for the benefit of the claimants, it would be entitled to equitable subrogation and would not be a mere volunteer or intruder. The fact that USF & G is so bound does not mean, however, that Elm Haven had any obligation that distinguished it from a volunteer or intruder.
 
 
 24
 We also affirm the grant of summary judgment against Elm Haven's claim for breach of the implied covenant of good faith and fair dealing underlying the Performance Bond. Under Connecticut law, "[e]very contract carries an implied covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." Habetz v. Condon, 224 Conn. 231, 238, 618 A.2d 501 (1992). "Bad faith means more than mere negligence; it involves a dishonest purpose." Id. at 237, 618 A.2d 501. By the time Elm Haven declared Neri to be in default in the June 26 letter, Elm Haven had already taken actions sufficient to nullify its own rights to the benefits of the Performance Bond — namely, it had hired a replacement subcontractor. USF & G did nothing, and could have done nothing at that point, to breach the implied covenant of good faith and fair dealing; by the time it learned of the default, Elm Haven had already breached the terms of the Performance Bond. Furthermore, USF & G did not breach the implied covenant by failing to respond to Elm Haven's earlier letters; none of them constituted a declaration of default, and USF & G was entitled to take action only after such a declaration had been made. See L & A Contracting, 17 F.3d at 111 ("Before a declaration of default, sureties face possible tort liability for meddling in the affairs of their principals.").
 
 CONCLUSION
 
 25
 For the foregoing reasons, the judgment of the district court is affirmed.